356 So.2d 799 (1978)
In re INTEREST ON TRUST ACCOUNTS, A PETITION OF THE FLORIDA BAR to Amend the Code of Professional Responsibility and the Rules Governing the Practice of Law.
No. 51182.
Supreme Court of Florida.
March 16, 1978.
Russell Troutman, President of The Florida Bar, Winter Park, William E. Sherman, Chairman of The Florida Bar Committee, DeLand, Leonard H. Gilbert, Chairman of The Florida Bar Integration Rule and By-law Committee, Tampa, and Norman A. Faulkner, Staff Counsel, Tallahassee, for The Florida Bar, for petitioner.
Response to Petition by:
Henry P. Trawick, Jr., Sarasota, Russell E. Carlisle, Fort Lauderdale, and Robert L. Travis, Jr., Tallahassee, for Florida Legal Services, Inc., amicus curiae.
Earle W. Peterson, Jr. of McCune, Hiaasen, Crum, Ferris & Gardner, Fort Lauderdale, C. Gary Williams of Ausley, McMullen, McGehee, Carothers & Proctor, Tallahassee, for Florida Bankers Association, amicus curiae.
James H. Gilbert, Jr. of English, McCaughan & O'Bryan, Fort Lauderdale, and Robert M. Curtis of Saunders, Curtis, Ginestra & Gore, Fort Lauderdale.
ENGLAND, Justice.
The Board of Governors of The Florida Bar, with the concurrence of the Board of Directors of the Florida Bar Foundation, Inc., has petitioned this Court requesting that we amend the rules governing the practice of law in Florida to authorize attorneys to invest trust funds held for clients in order to generate investment income for the benefit of public interest programs related to the legal profession.[1] So far as we *800 can determine, this request is the first of its kind in the United States, although the use of clients' trust funds in the manner proposed has found acceptance in a number of other English-speaking jurisdictions.
We approve the Board's concept of authorizing interest-bearing trust accounts, under procedures and for uses more fully developed below, and we commend the Bar for proposing this significant and innovative program to improve the administration of justice and to expand the capabilities for its delivery.

I
Beginning in 1971, the organized bar of Florida began a study of the possible use of interest on clients' trust funds for public programs designed to improve the administration of justice. Extensive data was gathered from jurisdictions which have authorized like procedures, and periodic reports were developed both as to the feasibility and desirability of a proposal of this type in Florida. Activity on this project accelerated in 1976, and under the guidance of Bar president Ed Atkins, special committee chairman William Sherman, Bar Foundation president Burton Young, and Foundation special committee chairman Julian Clarkson, specific recommendations took shape. In late 1976, the governing boards of the Bar and the Foundation formally approved the concept of allowing interest-bearing trust accounts, after which specific implementing amendments to the Integration Rule, to the by-laws to the Rule, and to the Code of Professional Responsibility were presented to the Court.

II
The history of restrictions on the use of clients' trust funds is highly relevant to our decision today, as is the experience of other countries in authorizing their use. As regards the former, regulation of attorney trust accounts in Florida dates back to an 1828 act of the Legislative Council of the Territory of Florida.[2] In 1936 this Court adopted the Canons of Professional Ethics of the American Bar Association, incorporating the regulation of attorney trust accounts into the Court's rules.[3] After the regulatory structure of lawyers became formalized by integration of the bar,[4] the control of clients' funds remained subject to scrutiny under Rule XI, Section 2 of the Integration Rule.[5] In 1970 the Canons gave way to the present Code of Professional Responsibility,[6] which amplified the treatment of clients' trust funds through Disciplinary Rule 9-102.
The thrust of these several regulatory measures, as well as advisory opinions on the subject offered by ethics committees of the American Bar Association and The Florida Bar,[7] was to assure that lawyers, as *801 "trustees",[8] would neither misuse clients' funds nor impede their prompt delivery to the client on demand. Since general ethical proscriptions against misuse have not always been successful, we augmented those protections in 1966 by the creation of a Clients' Security Fund designed to compensate clients who might lose money held in trust for them by Florida attorneys.[9]
As the rules stand today, clients' funds held by an attorney must be segregated into a clearly labeled "trust account" unless they are received for the payment of fees or for the reimbursement of costs for services already rendered.[10] There is no inhibition, however, against an investment of clients' funds in a special trust account pursuant to the provisions of a specific trust document.[11] Clients' funds are not subject to counterclaim or set-off for attorney's fees,[12] and they must be available for prompt delivery to the client upon request.[13]
To guarantee compliance with these mandates, we recently amended trust accounting procedures to require attorneys in Florida to maintain strict records of all trust account transactions and to preserve these records for at least six years,[14] to reconcile trust account balances on a quarterly basis,[15] and to furnish to the Bar an annual certificate of compliance with trust accounting procedures.[16] A failure to comply with any of these requirements provides cause for the Bar to conduct an audit at the attorney's expense,[17] and any evidence of impropriety in the management of trust funds may, of course, lead to the initiation of disciplinary proceedings.

III
Absent any personal financial incentive to make clients' funds productive, and faced with the complex and expensive accounting problems inherent both in the investment of these funds and in the apportionment of their earnings among individual clients, attorneys have typically deposited clients' funds in non-interest-bearing commercial bank checking accounts.[18] Most attempts to devise a method whereby funds could be deposited in an interest-bearing account and, at the same time, be continuously available for prompt delivery to a client upon request, have run afoul of federal and state banking regulations which historically have barred the payment of any interest on *802 funds held in commercial bank checking accounts or the immediate withdrawal of funds held in savings accounts.[19] As a result of these forces, banks have been the beneficiaries of a system which requires substantial sums of interest-free money to be deposited with them for significant periods of time.[20]

IV
In several significant ways, recent changes and proposed modifications in U.S. banking practices, tracking earlier developments in other English-speaking jurisdictions, have eroded the various practical and legal problems which to date have barred the generation of earnings on attorney trust accounts. Negotiable Order of Withdrawal (NOW) accounts, which resemble checking accounts but permit the payment of interest at a rate slightly lower than that of ordinary savings accounts, have been approved for operation in the New England states, and the Federal Reserve Board of Governors has recommended to Congress that such accounts be made available nationally.[21] Commercial banks now generally honor telephonic instructions for the transfer of funds from a savings account to a checking account of the same depositor,[22] and some commercial banks accept written or oral "standing instructions" from depositors to the effect that savings account funds shall automatically be transferred into a checking account to meet overdrafts or other shortages.[23] Some savings institutions *803 will now accept automatic transfer instructions to a non-affiliated commercial bank.[24]
On the practical side, any technological difficulties attending the computation of account balances, charges, and earnings have long been resolved. Computers used in virtually all financial institutions have the capacity, and in fact are presently employed, to compute average periodic account balances (daily, monthly, etc.) for a variety of purposes, such as determining service charges and calculating savings interest. The institutional capability to meet the needs of the Bar's proposed program  to compute and pay interest on trust account balances  was documented by a close evaluation of the trust accounting system in Vancouver, British Columbia.

V
Interest is paid on attorney trust accounts in 17 jurisdictions around the world, and proposals to authorize such payments are under consideration in at least two others.[25] In response to inquiries from The Florida Bar, persons associated with programs presently operating in some of these jurisdictions have reported overwhelmingly favorable experiences with the results achieved, while encountering virtually no difficulty or expense in plan administration.[26]
As might be expected, specific plan features tend to vary somewhat among individual systems.[27] Nonetheless, the majority of programs have the following common elements:
(1) interest to be earned on clients' trust funds is computed by reference to a minimum or average balance in attorney trust accounts;
(2) interest from these accounts is channeled directly to a foundation established by the legal community to receive and disburse the earnings;
(3) earned income is allocated in part to pay claims arising from the loss or theft of clients' funds, and in part for distribution among various legal programs designed to improve the administration of justice, such as legal aid, scholarships and research.
The Canadian province of British Columbia, with a legal structure similar to our own,[28] has established an exemplary program *804 for collecting and using interest on clients' funds. It began in 1970 when the newly-formed Law Foundation of British Columbia began receiving interest on lawyers' trust accounts.[29] At a negotiated interest rate of 3%, the income produced in that first year of voluntary plan participation was approximately $50,000. By 1972 the plan was generating in excess of $250,000 annually for the Law Foundation, and the initial concerns of lawyers and bankers regarding the feasibility of the program were dispelled. In November of that year participation in the plan was made mandatory as to trust accounts with balances exceeding $5,000.[30] Three years later the program was made mandatory for the full balance in all trust accounts maintained by province lawyers for the deposit of their clients' funds. Interest income now totals over $2 million annually.[31]
No specific form of notification is required to be given to clients of British Columbia attorneys concerning the generation of income on their funds. As was traditionally the case there, large client deposits and amounts held for significant periods of time are invested specially to earn interest on the clients' behalf.
The income of the Law Foundation to date has been devoted predominantly to legal aid, to law libraries within British Columbia, and to law reform projects. A small portion has been used for administrative purposes and as a reserve. Professional management of the Law Foundation's funds is provided by investment advisers at Vancouver Trust Company. No intra-office bookkeeping burdens are imposed on province attorneys, and their only identifiable cost for fund participation appears to be the modest fee charged by their own accountants for a required annual certification of trust accounts.
Many features of the British Columbia program, which minimizes complexity, administrative burdens, and bar monitoring, are readily adaptable to a similar program in Florida.

VI
The Bar's proposal[32] to allow the collection of earnings on trust accounts contains these general features:
1. The plan would be voluntary, at least until such time as federal law permits the payment of interest on checking accounts or the writing of checks on savings accounts;
2. The proposal would be implemented under by-laws approved by the Board of Governors, rather than through our Integration Rule;
3. Clients' funds would be invested in savings accounts or in United States securities,[33] subject to immediate availability through transfer to attorney trust checking accounts;
*805 4. Attorneys would be permitted to establish three classes of trust accounts  interest-bearing "special accounts" for individual clients, interest-bearing "registered accounts" for multiple clients, and the traditional non-interest-bearing "general accounts" for multiple clients;
5. Earnings on interest-bearing registered accounts would fund programs of the Bar, the Foundation, and Florida Legal Services, Inc.,[34] designed to provide legal aid to the poor, to enhance the delivery of legal services, to provide supplemental protection to clients through the security fund, to improve and expedite grievance procedures, to make student loans, and to implement other programs aimed at improving the administration of justice;
6. Interest payments on these accounts would be transmitted from the respective financial institutions used by individual attorneys and firms directly to the Bar, no less frequently than annually; and
7. Although full disclosure would be required, it would be presumed in the absence of contrary instructions that clients prefer to have their funds placed in an interest-bearing registered account to obtain supplemental protection under the clients' security fund.
Florida Legal Services, Inc., a proponent of the Bar's general proposal, suggests that the proposed plan be modified in certain major respects. It recommends that the program be governed by the Integration Rule rather than the Bar's by-laws, and that a specific formula be established for public interest disbursements, subject to change by the Court, but ostensible and available to provide predictability in the establishment of legal benefit programs.

VII
Opponents of the Bar's proposal,[35] aside from their criticisms of select features of the proposal, offer these reasons why we should not approve the proposal in any form:
1. Inasmuch as the Court controls the admission and discipline of attorneys, it should not ask the lay public (clients) to ensure against the Court's errors in exercising supervisory powers;
2. The Court should not ask the lay public to pay for Bar programs;
3. The proposal is an attempt to divert funds rightly belonging to clients to the purposes of the Bar, casting a shadow of impropriety on the profession;
4. The proposal would conflict with ethical standards which prohibit attorneys from benefiting from the investment of their clients' funds;
5. The proposal creates potential conflicts of interest, such as providing incentives for an agreement by an attorney not to participate in the voluntary plan in exchange for a bank's reduction of interest charges on a personal loan;
6. The Bar has failed to present factual support for its recommendation, there being only conclusory statements as to the present banking procedures of attorneys regarding clients' trust funds and as to the benefits which banks allegedly derive from present practices;
7. The Bar's proposal conflicts with federal law, which prohibits banks from paying interest on checking accounts,[36] and thus seeks to do indirectly what the law prohibits doing directly;
8. Under present law, banks have the privilege of imposing a 30-day waiting period on savings account withdrawals, so that clients' funds may not always be available immediately upon request;
9. Commercial banks will be competitively disadvantaged since they, unlike savings and loan institutions, are prohibited *806 from holding savings deposits of more than $150,000;[37] and
10. Commercial banks will "be required to pay interest on some funds which they may now use without compensation to the depositor,"[38] but will not be reimbursed for the additional accounting and bookkeeping functions.
In light of the novelty of the Bar's proposal in this country, some discussion of the more plausible objections is appropriate.
The general characterization of the Bar's proposal as a mechanism by which money properly belonging to clients will be improperly diverted to the legal profession ignores several factors. First, the funds in question are not now available to individual clients, and for practical reasons cannot be made available to them.[39] To the extent that funds do and can benefit individual clients, the proposed changes do not alter current practices.[40] Second, it is misleading to suggest that interest generated under the Bar's proposal will accrue to the benefit of individual attorneys or to the organized bar, since the beneficiaries of the Bar's programs are members of the lay public. Society in general, not just the legal profession, benefits from the reimbursement of defalcations, from legal services provided to the poor, from student loans, and from more efficient machinery to purge and punish errant attorneys. Contrary to the assertion of legal impropriety, each of the purposes served by the Bar's proposal is now specifically recognized and encouraged in the code of conduct and in programs approved by this Court,[41] and by the organized bars nationwide.
Other objections are equally unconvincing. To meet the suggestion that the proposal conflicts with banking procedures and regulations, we observe that the Federal Reserve has expressly condoned the telephone transfer system and NOW accounts, both of which have features no different from the Bar's proposal.[42] To meet the suggestion that there is no evidence to show that banks presently benefit from current trust account restrictions, we note that the Florida Bankers Association has expressed its dissatisfaction with the prospect of paying interest on funds which are presently used at no cost. To meet the assertions of potential disadvantage to commercial banks, we simply note that banks now compete with savings associations for all other forms of commercial business, and, more importantly, that they alone have the advantage of being able to offer both savings and checking account services in the same institution  a convenience that might well compensate for any loss of business due to limitations on the amount which they can hold in savings deposits.
Finally, as regards potential conflicts of interest, we are not convinced that the Bar's proposal will pose problems which differ significantly from those inherent in the present freedom allowed attorneys in the selection of financial institutions for their business,[43] or that existing disciplinary procedures will be inadequate to cope with any problems that may arise.
In sum, we find that the reasons offered in opposition to the Bar's proposal do not warrant its rejection. Our accumulated acquaintance *807 with the actualities of the practice of law, supplemented by our experience in discharging our continuing responsibility to enforce the trust accounting provisions of our Integration Rule and the Code of Professional Responsibility, provide an adequate foundation on which to evaluate the risks of adopting the Bar's proposal. We find that these risks are minimal, and that they are far outweighed by the many potential public benefits which will flow from our approval of the Bar's proposal.

VIII
We conclude, therefore, that the Bar's proposal should be adopted, subject to the following major modifications:
1. Implementation will be effected through the Integration Rule rather than through by-laws alone;
2. Interest earned on trust accounts will be remitted to the Foundation rather than the Bar, at least quarterly, for distribution among the agencies which will provide approved services;
3. Clients' trust funds may be invested in savings accounts of qualified financial institutions, but not in U.S. government or other securities;
4. No filing of any sort with the Bar will be required other than a certificate of annual compliance with minimum trust account procedures, and no accounting and record-keeping requirements shall be imposed on plan participants other than those minimum requirements expressed in the new rules;
5. In lieu of special name designations for attorney trust accounts, all accounts in which clients' funds are deposited will, as they are now, simply be identified as "trust accounts";
6. Attorneys and law firms participating in the program shall obtain their clients' consent to the investment of trust funds by sending to each client a notice, in the form set out below, providing information concerning the new procedures and the uses of trust earnings. Attorneys will remain free, however, to exercise their discretion to arrange special investments (not limited to savings accounts) for the funds of their clients when appropriate;
7. Authority is provided for the availability of funds to meet a client's emergency needs in the event a financial institution refuses to allow the immediate withdrawal of funds held for the client in a trust savings account; and
8. In light of the number of trust accounts and financial institutions likely to be used by Florida attorneys under the plan, an annual certificate of trust account rectitude and of compliance with minimum trust accounting procedures, prepared by a certified public accountant, will be required of attorneys or firms electing to use a trust savings account.[44]

IX
To authorize Florida attorneys to invest clients' trust funds, we adopt the following amendments to the Integration Rule, to the by-laws implementing the Integration Rule, and to the Code of Professional Responsibility:[45]
1. References to savings and loan associations are added to the first sentences of Integration Rule 11.02(4)(a) and (b) so that they read, respectively:
"Any bank or savings and loan association account maintained by a member of The Florida Bar to comply with Disciplinary Rule 9-102 of the Code of Professional Responsibility is and shall be clearly labeled and designated as a trust account."
"A member of The Florida Bar shall preserve or cause to be preserved the records *808 of all bank and savings and loan association accounts or other records pertaining to the funds or property of a client maintained by him in compliance with Disciplinary Rule 9-102 for a period of not less than six years subsequent to the last transaction pertaining to the same or subsequent to the final conclusion of the representation of a client relative to such funds or property, whichever shall last occur."
2. Integration Rule 11.02(4)(c) is amended to read:
"(c) Trust Accounting Procedures. The Florida Bar shall promulgate by-laws under this rule, such by-laws and amendments thereto to be approved by this Court, prescribing minimum trust accounting records which shall be maintained and minimum trust accounting procedures which must be followed by all attorneys practicing in Florida who receive or disburse trust money or property. The minimum procedure shall require reconciliation of trust account balances at periodic intervals and the annual filing of a certificate reflecting compliance with minimum record keeping and procedural requirements, which certificate shall be prepared by a certified public accountant if one or more trust savings accounts are utilized. Failure to file the required certificate, the filing of a trust savings account certificate showing non-compliance with the by-laws, or the return of a trust account check for insufficient funds shall be good cause for The Florida Bar to order an audit of the trust account at the cost of the attorney audited. Other audits for cause conducted by The Florida Bar shall be at the cost of the attorney audited unless the audit reveals that the attorney was without fault and that his trust account records and procedures are in substantial compliance with the minimum requirements."
3. Section (B)(1) of the by-laws implementing Integration Rule 11.02(4)(c) is amended to read:
"1. A separate bank account or accounts, and if utilized a separate savings and loan association account or accounts, clearly labeled and designated a trust account as provided in Rule 11.02(4)(a)."
4. Section (B) of the by-laws implementing Integration Rule 11.02(4)(c) is amended to add a new paragraph (6) to read:
"6. A journal or other appropriate record documenting all transactions relating to any bank or savings and loan association trust savings account, and copies of all bank or savings and loan association reports or correspondence reflecting periodic account balances and the earnings thereon."
5. Section (D) of the by-laws implementing Integration Rule 11.02(4)(c) is amended to add a new paragraph (3) to read:
"3. If one or more trust savings accounts are maintained during the preceding calendar year, then in lieu of the filing required in paragraph (2) the lawyer or law firm shall file with The Florida Bar between June 1 and August 15 of each year a certificate prepared by a certified public accountant stating:
"I certify that I have examined all trust accounts of [lawyer or law firm name] and have determined that there have been no overdrafts or shortages in those accounts, that all account balances reconcile as of the close of the fiscal year ending ____, and that related records and accounts are in substantial compliance with the minimum requirements as to trust accounting records and procedures set forth in the by-laws under Florida Bar Integration Rule 11.02(4).
__________________________________
Certified Public Accountant"
In the event that any account reflects an overdraft or shortage during the year, or any trust account balance does not reconcile, or the records and accounts are not in substantial compliance with the by-laws, the accountant shall so state in lieu of providing this certificate of compliance and the lawyer or law firm may file with the Bar, along with the accountant's *809 statement, a written explanation for the failure to meet certification requirements.
6. The preliminary clause of Disciplinary Rule 9-102(A) of the Code of Professional Responsibility is amended to read:
"All funds of clients paid to a lawyer or law firm, other than including[46] advances for costs and expenses, shall be deposited in one or more identifiable bank or savings and loan association accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:"
7. A new Integration Rule 11.02(4)(d), publishable without the footnote comment, is adopted to read:
"(d) Trust Savings Accounts. A member of The Florida Bar who elects to create or maintain a trust savings account shall comply with the following provisions:
(i) A trust savings account may be established with any bank or savings and loan association authorized by federal or state law to do business in Florida and insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation.[47]
(ii) Except as otherwise required by law, funds in each trust savings account shall be subject to withdrawal, or to transfer to a trust checking account, upon request and without delay. Any depository institution permitted by law to require advance notification (30 or 60 days) before allowing withdrawal of savings deposits is nonetheless eligible to act as a depository for trust savings accounts under this rule if it meets the requirements of paragraph (i) above, provided the institution has not acted to delay the withdrawal of deposited funds (other than for the clearance of deposited funds or for good cause attributable to the circumstances of the particular depositor rather than the institution's financial needs or general policy) at any time during the past five years. An otherwise qualified institution which has not been in existence for five full years may serve as a trust savings account depository if it has met the requirements of this subsection throughout its existence.
(iii) An institution shall cease to be eligible for the receipt of trust savings funds at such time as it fails to qualify under paragraphs (i) or (ii). Any lawyer or law firm maintaining a trust savings account against which immediate withdrawal rights are refused shall immediately notify the Florida Bar Foundation, Inc. of the name and address of the depository institution and the date of such refusal.
(iv) If, pursuant to governing law or banking regulations, a depository institution requires notice in writing for an intended withdrawal not less than 30 days before such withdrawal is made, the lawyer or law firm may certify to the Florida Bar Foundation, Inc. that the client's funds detained as a result of the depository institution's notification requirement are needed immediately for the client's affairs.
(A) Upon receiving such certification, the Foundation shall be authorized to advance to the certifying lawyer or law firm, from the interest earned on trust savings accounts, an amount of money necessary to meet the client's emergency needs subject, however, to limitations expressed in subparagraph (C).

*810 (B) Simultaneously with certification, the lawyer or law firm shall direct the depository institution in writing, with a copy to the Foundation, that upon the expiration of the notification period detained funds equal to the amount advanced by the Foundation shall be remitted directly to the Foundation.
(C) The Board of Directors of the Foundation may adopt rules of procedure reasonably necessary to implement the authority provided in subparagraph (A) and to assure full reimbursement of sums advanced. Periodically the Board may set dollar limitations on the amount of money which may be advanced to meet the emergency needs of any client in the event a notification requirement is imposed by a depository institution.
(v) The rate of interest payable on any trust savings account shall not be less than the rate paid by the depository institution to regular, non-attorney savings depositors. Higher rates offered by the institution to customers whose deposits exceed certain time or quantity minima, such as those offered in the form of certificates of deposit, may be obtained by a lawyer or law firm so long as there is no impairment of the right to withdraw or transfer principal immediately (except as accounts generally may be subject to statutory notification requirements), even though interest may be sacrificed thereby.
(vi) Lawyers or law firms electing to deposit client funds in a trust savings account shall direct the depository institution:
(A) to remit interest or dividends, as the case may be, on the average monthly balance in the account, at least quarterly, to the Florida Bar Foundation, Inc.;
(B) to transmit with each remittance to the Foundation a statement showing the name of the lawyer or law firm for whom the remittance is sent and the rate of interest applied; and
(C) to transmit to the depositing lawyer or law firm at the same time a report showing the amount paid to the Foundation, the rate of interest applied, the average account balance for each month of the period for which the report is made, and any remittances to the Foundation made during that period pursuant to subparagraph (iv)(B).
(vii) Lawyers and law firms electing to deposit client funds in a trust savings account shall transmit to each client for whom trust funds are now held, and to each new client for whom funds are to be held, a copy of the notice reproduced below. The Florida Bar shall print and maintain a supply of this notice, and distribute copies without charge to those who may request them. The Bar's costs for printing and distribution shall be treated as a cost of administering the program, and shall be reimbursed to the Bar by the Foundation from interest earned on trust accounts.
"Important Notice to Clients

For your protection, the Florida Supreme Court requires that all funds of a client which are held by an attorney must be deposited in a trust account separate from the attorney's, and must be kept available for immediate withdrawal. Because most clients' funds which come into the hands of attorneys are relatively small in amount or are to be held for relatively short periods of time, it is impractical for attorneys to establish a separate account for each client or to invest each client's funds to earn interest. For this reason client funds are held in a common trust checking account on which the depository bank pays no interest.
Under a new program approved by the Florida Supreme Court, attorneys are now permitted to deposit clients' common trust funds in savings accounts. Due to the expense and complexity which would attend any attempt to compute or distribute the interest attributable to each *811 client's funds, it is not feasible to pay to individual clients the earnings on their proportionate share of common trust savings accounts. Of course, no attorney is permitted to receive the earnings on a client's funds, either. Rather, under the Supreme Court's new directive, the interest income from clients' deposits will be used to fund programs designed to benefit the general public.
The goals of the Court's program are to improve the administration of justice in this state, to expand the delivery of legal services to the general public, and to enhance the bar's ability to reimburse clients who may lose money as a result of an attorney's misconduct or errors.
We have sent you this explanation, at the direction of the Florida Supreme Court, to advise you that we are participating in the Court's new program and that the funds you have entrusted to us for your affairs (other than attorneys' fees) will be deposited in an interest-bearing trust savings account unless you specifically give us written instructions to the contrary. A directive not to allow such use of your funds will not produce income for you. Your funds will simply be placed in a non-interest-bearing trust checking account until needed."

X
The Florida Bar Foundation, Inc. has offered its support to the Bar's proposal and has agreed to do whatever is necessary for its implementation. Its governing documents are presently unsuited to the responsibilities it will have under the new program. Consequently, it will be necessary to amend the charter and by-laws of the Foundation in addition to the Integration Rule, the by-laws, and the Code of Professional Responsibility. Accordingly, the officers and directors of the Foundation are directed to initiate prompt amendatory steps under Article 10 of the charter to meet the following requirements, and to make any other changes not inconsistent therewith which may be necessary to carry out the Foundation's additional responsibilities and expanded activities under this directive:
1. The Board of Directors shall be expanded to include as permanent board members the Chief Justice of the Florida Supreme Court, two other judicial officers to be appointed by the Chief Justice and to serve at his pleasure, the president of The Florida Bar, and the chairman of the board of Florida Legal Services, Inc.
2. The charter of the Foundation should expressly authorize distributions of Foundation funds to The Florida Bar and to Florida Legal Services, Inc., and it should expressly authorize the use of Foundation funds for any of the following purposes:
(a) to provide legal aid to the poor;
(b) to provide for the adequate delivery of legal services to all members of the public;
(c) to augment the clients' security fund with a view toward full reimbursement;
(d) to fund a more expeditious and efficient grievance mechanism;
(e) to provide student loans;
(f) to improve the administration of justice; and
(g) for such other programs for the benefit of the public as are specifically approved by the Court from time to time.[48]
3. The Board of Directors shall be required to meet at regular specified intervals, at least semi-annually.
4. The charter shall authorize capital expenditures, accumulations, or reserves only as may be necessary to meet the reasonable working needs of the Foundation in administering this program and to assure the *812 payment of advances authorized under Integration Rule 11.02(4)(d)(iv).
5. The charter shall expressly authorize the retention of professional investment advisory services.

XI
These amendments to the Integration Rule, to the by-laws, and to the Code of Professional Responsibility shall become effective at 12:01 A.M. on July 1, 1978, or on such earlier date as the Court may specify after being notified that the Foundation's charter amendments have been filed with the Secretary of State.
It is so ordered.
OVERTON, C.J., and BOYD, SUNDBERG, HATCHETT and KARL, JJ., concur.
ADKINS, J., dissents.
NOTES
[1] Original jurisdiction vests in this Court pursuant to Art. V, § 15, Fla. Const.
[2] Entitled "An Act to prescribe the mode by which attorneys and counsellors at law may be admitted to practice in the Courts of the Territory," § 7 of that Act provided:

"Be it further enacted that if any attorney collects money for his employers and refuses to pay it over on demand, he shall be stricken from the rolls and not allowed to practice within the territory until he shall pay over the money to his client or legal representative and he shall be liable for suit for the same and subject to a penalty of ten percent for every month he detains the same after a demand regularly made."
[3] In re Canons of Professional Ethics, 125 Fla. 501, 506 (1936). "11. Dealing With Trust Property. Money of the client or other trust property coming into the possession of the lawyer should be reported promptly, and except with the client's knowledge and consent should not be commingled with his private property or be used by him."
[4] Petition of Florida State Bar Ass'n, 40 So.2d 902 (Fla. 1949).
[5] "Where money or other property has been entrusted to an attorney for a specific purpose, he must apply it to that purpose. He may not avail himself of a counterclaim or setoff for fees against any money or other property of his clients coming into his hands, and a refusal to account for and deliver over such money or property upon demand shall be deemed a conversion."
[6] In re Integration Rule of the Florida Bar, 235 So.2d 723 (Fla. 1970).
[7] See, e.g., ABA Informal Opins. 545 (May 31, 1962) and 991 (July 3, 1967); Fla.Bar Advisory Opins. 72-13 (May 9, 1972) and 76-30 (Sept. 13, 1976).
[8] "The very nature of the lawyer's business is that of trustee." Petition of Florida State Bar Ass'n, 40 So.2d 902, 909 (Fla. 1949).
[9] Fla.Bar Integr.Rule, art. XVII, adopted in In re Integration Rule of The Florida Bar, 186 So.2d 781 (Fla. 1966) (subsequently amended in In Matter of The Florida Bar, 237 So.2d 150 (Fla. 1970)), and Fla.Bar Integr.Rule By-laws, art. XVI. For a concise but thorough discussion of the origins and operation of the Clients' Security Fund, see Atkins and Kane, Clients' Security Fund Maintains Bar's Integrity, 44 Fla. B.J. 130 (March 1970).
[10] Fla.Bar Code Prof.Resp., DR 9-102(A), and Fla.Bar Integr.Rule, art. XI, Rule 11.02(4)(a). But see note 46 below, and accompanying text.
[11] See by-laws implementing Integration Rule 11.02(4)(c), subsection (A), as approved by this Court in In re Amendment to Integration Rule Article XI, 338 So.2d 1072 (Fla. 1976).
[12] Fla.Bar Integr.Rule, art. XI, Rule 11.02(4).
[13] Fla.Bar Code Prof.Resp., DR 9-102(B)(4).
[14] Fla.Bar Integr.Rule, art. XI, Rule 11.02(4)(b).
[15] See by-laws implementing Integration Rule 11.02(4)(c), subsection (D)(1).
[16] See Fla.Bar Integr.Rule, art. XI, Rule 11.02(4)(c), and by-laws implementing Integration Rule 11.02(4)(c), subsection (D)(2). Implementation of the annual compliance certificate was deferred by the Court for one year, however. In re The Florida Bar, 346 So.2d 1033 (Fla. 1977).
[17] Fla.Bar Integr.Rule, art. XI, Rule 11.02(4)(c). We are told that trust account abuse and neglect are the predominant causes of lawyer disciplinary proceedings. Our case law bears this out. Trust account difficulties were evident in approximately 56% of all reported disciplinary actions against Florida attorneys from Jan. 1, 1970, to Jan. 1, 1977.
[18] Clients' deposits vary so widely in both amount and duration that it would be exceedingly difficult, if not impossible, to apportion the interest earned on a general account among the respective clients whose funds from time to time compose it. The establishment of separate accounts for each individual client would also be highly impractical.
[19] 12 U.S.C. § 371a (1945) provides in pertinent part:

"No member [of the Federal Reserve System] shall, directly or indirectly, by any device whatsoever, pay any interest on any deposit which is payable on demand... ."
See also 12 C.F.R. §§ 217.1(e)(2), 217.2-.5 (1977).
§ 654.02, Fla. Stat. (1975) provides:
"No savings bank or institution ... shall be required to pay any deposit with such company until the depositor shall have first given it 60 days' notice that he intends to require payment of such deposits."
See also § 656.18(1), Fla. Stat. (1975) (prohibiting industrial savings banks from carrying "commercial or demand banking accounts") and § 665.708, Fla. Stat. (1975) (the "Savings Association Act", permitting such associations to accept only such deposits and other accounts as "may be used for fixed, minimum, or indefinite periods of time of not less than 30 days... .").
[20] Even small amounts received from a variety of clients for varying periods can result in large average monthly balances in attorney trust accounts. Large short-term client deposits, or modest deposits to be held for significant periods, are usually invested by attorneys in an interest-bearing medium for the client's benefit. See Fla.Bar Advisory Opin. 76-30 (Sept. 13, 1976), approving this form of investment based on full disclosure.
[21] See "Burns Eyes Interest on Bank Checking", Tampa Tribune, March 11, 1977, at 20-A, col. 1. The Financial Institutions Act of 1975, which passed the U.S. Senate as Senate Bill 1257 in December of 1975 but failed to win approval in the House, would have permitted NOW accounts to be offered by commercial banks, savings and loan associations, and mutual savings banks on a nationwide basis. See Fed.Banking L.Rep. (CCH), No. 547, paragraph 96,493, March 27, 1975.
[22] Withdrawal of savings deposits by telephone has been specifically permitted since the Federal Reserve Board of Governors withdrew its objections to such transactions in 1975. The Board noted that its policy against telephone withdrawal services, which had been in effect since 1936, was no longer necessary because "security and record-keeping devices made possible by new technology ... will keep errors and unauthorized use to a minimum." The change in policy was further explained as follows:

"(c) The Board recognizes that the telephone has become an accepted medium for transmitting financial data and that the telephone merely provides the customer with an additional method of communicating instructions regarding his account to his bank. In fact, numerous other depository institutions including nonmember commercial banks and savings and loan associations have for some time been permitted to offer telephone withdrawal services."
12 C.F.R. § 217.152 (1977).
[23] This information was determined in early 1976 by telephone inquiries to appropriate officers of the Barnett Banks of Jacksonville and Tallahassee, the Exchange National Bank of Tampa, and the Southeast First National Bank of Miami. The Board of Governors of the Federal Reserve has now proposed a rule which would permit member banks to arrange with their depositors for the automatic transfer of funds from depositors' savings accounts to their demand deposit (checking) accounts. Prop.Reg. § 217.5, 43 Fed.Reg. 5008 (1978).
[24] In a recent interview appearing in the official publication of the Florida Bankers Association concerning the trend toward the establishment of savings and loan association checking accounts, the president of one of the ten largest publicly held savings and loan organizations rejected the need for this innovation, stating:

"Well, our customers can transfer money from their savings accounts to their checking accounts at their commercial banks through electronic funds transfer, or they will be able to do it very shortly, and this can be done quickly. We don't need checking accounts for S & L's on top of that. It just creates more paperwork."
The full interview is reported in 4 FLORIDA BANKER 19-21 (Sept. 1977).
[25] Interest-bearing trust account programs are currently operating in the Republic of South Africa, South West Africa, Rhodesia, the Australian states of Victoria, New South Wales, South Australia, Queensland, the Australian Capital Territory, and the Canadian provinces of Ontario, Alberta, Manitoba, New Brunswick, Prince Edward Island, Nova Scotia, Saskatchewan, Quebec, and British Columbia. Similar plans are under consideration in England and Newfoundland.
[26] The only unfavorable experience that has come to our attention is not attributable to the earnings concept, but rather reflects a defect in the client protection methodology. The Australian state of Victoria reports that a monumental "defalcation" by one solicitor in 1975 resulted in claims against the Solicitors' Guarantee Fund that totaled $8.5 million. Under the program all clients were required to be reimbursed, and as a consequence the fund was exhausted. It is noteworthy that, although significant amendments to the relevant statutory provisions are being contemplated to ensure against a recurrence of such drains on the fund, the earnings program there remains intact.
[27] For example, the African countries have adopted plans under which participation is optional, while Australian and Canadian programs, some of which began as optional plans, are now uniformly mandatory.
[28] The legal profession in Canada has a voluntary national bar association similar to the American Bar Association. Lawyers in British Columbia are part of an integrated bar (The Law Society of British Columbia), governed by a Board of Governors (The Benchers). A non-profit organization (the Law Foundation) was created independently of the Benchers to receive interest earned on lawyers' accounts. The intra-province structures parallel closely The Florida Bar, its Board of Governors, and the Florida Bar Foundation, Inc.
[29] Interest-bearing accounts were approved in British Columbia pursuant to statutory authority under § 37(1)(k) of the "Legal Professions Act", R.S.B.C. 1960, c. 214, enacted in 1969, c. 15, s. 15. Unlike our Florida Bar, which operates entirely within the domain of this Court under Art. V, § 15 of the Florida Constitution, the Law Society of British Columbia derives its existence and powers from the Legislature.
[30] "Part H" of the Law Society Rules, promulgated pursuant to § 37(1)(k) of the "Legal Professions Act", R.S.B.C. 1960, c. 214, as amended by 1972, c. 32, s. 2 (since rep. and sub. 1974, c. 49, s. 2). The authority of the Law Society to make rules requiring members to utilize interest-bearing trust accounts was upheld by the British Columbia Supreme Court in McAfee v. Law Society of British Columbia, 57 D.L.R.3d 730 (B.C.Sup.Ct. 1975).
[31] Law Foundation Annual Report for the fiscal year ending April 30, 1976.
[32] The Bar's first proposal, directing the proceeds of trust account earnings predominantly to client security fund purposes, was amended early in 1977 to allow the use of income for a variety of public interest purposes.
[33] Investments of this type were approved by the Florida Bar Ethics Committee in Advisory Opin. 76-30 (Sept. 13, 1976).
[34] Florida Legal Services, Inc. is a non-profit legal services corporation devoted to organizing and funding a state-wide network of civil legal services for the poor. The board of directors is appointed by the Governor and the Bar.
[35] The Florida Bankers Association and three law firms.
[36] See note 19 above.
[37] 12 C.F.R. § 217.1(e)(1) & n. 4 (1977). This limitation was effectuated through Regulation Q, as promulgated pursuant to § 19 of the Federal Reserve Act, 12 U.S.C. § 371b (1945).
[38] Brief of Florida Bankers Association, as amicus curiae, at page 6.
[39] See note 18 above.
[40] See notes 11 and 20 above, and accompanying text.
[41] Fla.Bar Code Prof.Resp., EC 8-1 states that lawyers "should participate in proposing and supporting legislation and programs to improve the system," and EC 8-9 provides in part that "lawyers should encourage, and should aid in making, needed changes and improvements" in our legal system. See also Fla.Bar Code Prof. Resp., EC's 1-1, 2-1, 2-25, and 8-2.
[42] See notes 21 and 22 above, and accompanying text. To the same effect is the Federal Reserve's new proposal to allow automatic transfers from savings to checking accounts. See note 23 above.
[43] See Fla.Bar Code Prof.Resp., DR's 5-101(A) and 5-107(A)(2).
[44] Only 20 financial institutions are located in British Columbia, in contrast to the hundreds available in Florida. An accountant's certificate is nonetheless required in British Columbia.
[45] Where existing provisions are amended, italics indicate language or punctuation which has been added and strike-throughs indicate language or punctuation which has been deleted.
[46] This change conforms DR 9-102(A) to Integration Rule 11.02(4).
[47] This provision does not alter Fla.Bar Advisory Opin. 72-37 (Nov. 27, 1972), in which the Bar's Professional Ethics Committee concluded that lawyers are not required to deposit trust funds in a manner that would provide complete FDIC coverage. Deposits of client funds in a trust savings account may with impunity exceed the insurance limit set by law for such accounts.
[48] These purposes are derived from the Bar's proposal, as modified by its amendatory motion of March 24, 1977. See note 32 above.