PARIENTE, J.,
concurring.
I concur in the majority’s decision to deny the petition at this time. I write separately to explain my reasoning for doing so and to emphasize the critical role of The Florida Bar in solving the current legal aid crisis.
I.
Access to justice for all Floridians is fundamental to our legal system and our state. Indeed, it is a fundamental constitutional right.[3] For years, this Court has been on the forefront of efforts to promote equal access to justice, and we must continue to ensure — as our Chief Justice has rightly prioritized — that we provide leadership on this issue.
I commend the Chief Justice for the creation of the Florida Commission on Access to Civil Justice and his laudable efforts to bring the governmental and business communities together to consider holistic solutions regarding the access to justice issue, in order to assist all individuals for whom legal services have become unaffordable. But the important work of that Commission is not, standing alone, the reason I join the majority in rejecting this proposal.
A.
I agree with the majority’s decision to deny the petition because the petition does not require The Florida Bar to raise the annual membership fee, and the Bar has steadfastly opposed the approach suggested by the Petitioners. In fact, if granting this petition would mandate that the Bar make the assessment of $100,1 would join Justice Quince’s dissent that recognizes the necessary role of lawyers in doing *255 their part to solve this societal problem. While there is no one solution, dedicating additional funding to legal aid from the annual dues would be one step the legal community could take now to further its unique commitment to this cause — and to the many Floridians who are affected every day by the current crisis.
But however well-motivated those lawyers who have filed this petition, the petition does not currently ask this Court to mandate that the Bar assess each member up to $100 to dedicate to funding legal aid. As counsel for the Petitioners conceded during oral argument, even if this Court were to grant the petition, “no fees will be increased.” Oral Argument at 01:08, In re Amends, to Rule Reg. Fla. Bar 1-7.3, No. SC14-1165, available at http://wfsu.org/ gavel2gavel/viewcase.php?eid=2200 (Dec. 2, 2014).
This is because the Bar’s leadership and its Board of Governors have unanimously stated that they would not vote to assess each Bar member any additional fee. In addition, and an issue in need of resolution prior to any decision to grant the petition, the Bar has raised concerns as part of its opposition that the manner in which the fee would be assessed could constitute an improper tax. For these reasons, I must join the majority in denying the petition at this time.
B.
In concurring, however, I urge that the Bar work with the Petitioners to devise some alternative, creative solutions to the immediate crisis while the Commission on Access to Civil Justice undertakes its analysis and recommends long-term solutions to address this issue in a comprehensive way. As the Petitioners stated at oral argument, this petition “provides a point of discussion” and brings this issue to the forefront of “the Bar’s radar.” Id. at 43:55-44:15. I certainly agree that it belongs there as a “first priority” and that these discussions are necessary to solving the crisis. Id at 44:30.
The denial of this petition neither prevents the Bar from increasing the annual fee and allocating a portion of the increased fee to support legal aid, nor suggests that such an approach ultimately may not be part of the cure to the legal aid crisis. Florida’s annual Bar membership fee has not been increased since 2001 and remains comparably low relative to many other states around the country.[4]
The Bar has now recognized that the provision of legal Services to low-and middle-income Floridians is a societal concern and that lawyers have a special obligation to fund and support legal aid services. Certainly, this provides much common ground upon which some of our legal community’s leaders could come together. Both the efforts of the Bar — working in tandem with the Petitioners — and the efforts of the Commission are necessary to look at immediate funding alternatives for a more permanent fix. Nothing in the majority’s opinion suggests otherwise. In my view, the Bar and all lawyers in this state should, in the meantime, continue to do their part through pro bono representation and monetary contributions to legal aid.
II.
Although addressing the current crisis will require broad-based solutions, the piv *256 otal role of The Florida Bar cannot be understated. From the time of forming an integrated bar in 1949 — that is, one that compelled membership for all attorneys licensed in Florida — this Court has emphasized the unique role of lawyers in society. See Petition of Fla. State Bar Ass’n, 40 So.2d 902, 908-09 (Fla.1949).
At that time, there were only '2,700 lawyers in Florida and the proposéd annual dues were a mere $5.00. Id. at 903-04. Of the 2,700 lawyers, "1,631 returned ballots on the question of bar integration, with 1,131 in favor and 500 against. Id. at 904. In addition to determining whether integration would “best serve the interest of the bar and the public,” one of the issues to be decided was whether this Court had the “power to require the payment of a membership fee as an incident to its power to integrate.” Id.
In granting the petition, this Court observed that “the bar has a responsibility to the public that is unique and different in degree from that exacted of the members of other professions.” Id. at 908. From .the very beginning, the Oath of Attorney taken by every individual admitted to practice law in Florida has required each lawyer to affirm that he or she “will never reject, from any consideration personal to myself, the cause of the defenseless or oppressed, or delay any person’s cause for lucré or malice.” In re Amends. to Rules Reg. Fla. Bar-1-3.1(a) & Rules of Jud. Admin. — 2.065 (Legal Aid), 573 So.2d 800, 803 (Fla.1990) (emphasis omitted) (quoting Rules Relating to Ethics Governing Bench and Bar, 145 Fla. 763, 797 (1941)). “This provision identifies one of the specific public responsibilities lawyers have as officers of the court.” Id.
In 1978, the initial step was taken regarding institutionalizing the manner in which the Bar could assist in ensuring those obligations when this Court authorized the first-of-its-Mnd rule creating Interest on Trust Accounts (IOTA), see Petition re Interest on Trust Accounts, 356 So.2d 799 (Fla.1978), which became the backbone in the ensuing decades of funding legal services for the poor, legal services for children, and innovative programs for improving the administration of justice. While that program began as voluntary, upon petition of concerned members of the Bar, IOTA became mandatory in 1989. Matter of Interest on Trust Accounts; Petition to Amend Rules Reg. Fla. Bar, 538 So.2d 448, 451 (Fla.1989).
During that same time period, a petition was filed by members of the Bar to mandate that lawyers provide twenty-five hours of free legal service to the poor or, in the alternative, donate $500 to the Florida Bar Foundation. In re Emergency Delivery of Legal Services to the Poor (Mandatory Pro Bono), 432 So.2d 39, 40 (Fla.1983). This Court explained that the “request ha[d] been prompted, in part, by recent federal budget cuts in funding for legal services programs.” Id.
This Court rejected the proposal, but not without acknowledging the “unique position” that lawyers occupy in our society. Id. While we recognized that lawyers have a responsibility to render legal services to the poor, we also stated that the obligation to assure that “effective legal services are available to all is not the sole responsibility of lawyers but is one to be shared by the government and society.” Id. at 41 n. 1. We noted, however, the then-existing Ethical Considerations within the Code of Professional Responsibility:
There are people in need of legal services who are unable to pay for those services. All persons, however, should have the. opportunity of obtaining effective legal services and should have meaningful access to the courts. The legal profession and this Court have rec *257 ognized that fact in Ethical Consideration 2-25, Code of Professional Responsibility:
Historically, the need for legal services of those unable to pay reasonable fees has been met in part by lawyers who donated their services or accepted court appointments on behalf of such individuals. The basic responsibility for providing legal services for those unable to pay ultimately rests upon the individual 'lawyer, and personal involvement in the problems of the disadvantaged can be one of the most rewarding experiences in the life of a lawyer. Every lawyer, regardless of professional prominence or professional workload, should find time to participate in serving the disadvantaged. The rendition of free legal services to those unable to pay reasonable fees continues to be an obligation of each lawyer, but the efforts of individual lawyers are often not enough to meet the need. Thus it has been necessary for the profession to institute additional programs to provide legal services. Accordingly, legal aid offices, lawyer referral services, and other related programs have been developed, and others will be developed, by the profession. Every lawyer should support all proper efforts to meet this need for legal services.
The responsibility of lawyers in this area is repeated in Ethical Consideration 8-3, Code of Professional Responsibility:
The fair administration of justice requires the availability of competent lawyers. Members of the public should be educated to recognize the existence of legal problems and the resultant need for legal services, and should be provided methods for intelligent selection of counsel. Those persons unable to pay for legal services should be provided needed services.
The message to lawyers is thus plainly stated.
Id. at 41.
Although that petition to require mandatory pro bono services was ultimately rejected, this Court in 1991 once again considered the issue of access to justice and the obligation of Florida lawyers to represent the poor when called upon by the court. In re Amends. to Rules Reg. Fla. Bar, 573 So.2d at 801. That effort was, like the others before it, led by individual prominent members of the Bar — some of whom, such as Talbot D’Alemberte, have been on the forefront of bringing this issue to the attention of this Court from the inception of the integrated bar through the present.' While deferring action on the requirement that each judicial circuit develop a plan to address the legal needs of low-income individuals, we appointed a Joint Access Commission to further address the pressing issué. But we were unwavering in our commitment to ensuring that all citizens have access to the court system, including the ability to seek legal services:
The poor’s access to the legal system is an important factor that the commission will address. In order for this justice system to maintain credibility,'we realize that it must be available and affordable to all segments of society. Availability, not only for the poor, but ‘also for those with limited funds, is another problem that merits the commission’s consideration. This Court and The Florida Bar have regularly adopted programs to improve the accessibility of our judicial system. These include simplified proc'eedings in small claims court, probate, and dissolution of marriage matters; the development of simplified forms for a litigant’s pro se *258 use; the establishment of citizen dispute settlement centers; and the recent implementation of mediation and arbitration programs designed to resolve disputes in an efficient and economical manner. This Court has repeatedly recognized its responsibility to assure access to the courts. We await the commission’s recommendation before addressing petitioners’ suggestions on how to best meet the needs of the poor. We request that the commission file its report by February 1, 1991.
In conclusion, Thomas Jefferson once said: “There is a debt of service due from every man to his country proportioned to the bounties which nature and fortune have measured to him.” The lawyers of this state have recognized that they have a debt of service to the poor in the oath each took upon becoming a member of the legal profession and an officer of the courts. This important commitment assures a justice system for all. We acknowledge our responsibility to provide the necessary leadership to accomplish that goal.
Id. at 806-07 (emphasis supplied) (footnote omitted).
Two years later, when the Joint Access Commission’s report came back to this Court, we recounted the key findings:
In this report, the Commission states that the “[c]ritical legal needs of the poor generally and of groups with special legal needs such as children, institutionalized persons, and migrant farm workers are not being met with present resources and will not be met with the presently anticipated increase in resources.” The Commission “concludes that only approximately twenty percent of the legal needs of the poor are being addressed.” In its thorough and detailed report, the Commission made thirty-one recommendations....
In summary, recommendation No. 24: (a) describes a range of activities for volunteer lawyers; (b) suggests a minimum for each attorney of twenty hours of voluntary pro bono legal services, which can be collectively met under certain circumstances, or an alternative contribution to legal services of $350; (c) narrowly defines pro bono services to assure availability of legal services to the poor; (d) suggests that these services be developed and controlled by local community entities; (e) suggests that all lawyers be included in the plan to the extent legally and practically feasible; (f) suggests additional resources to support the plan; (g) describes a means to determine accountability of lawyer participation; and (h) suggests an evaluation and review of the effectiveness of this plan after two years.
The Board of Governors of The Florida Bar has endorsed the Commission’s voluntary pro bono plan and urges its adoption with certain modifications. These modifications include: (1) eliminating the collective satisfaction of the twenty-hour requirement; (2) expanding the definition of pro bono services to include services to the poor which are not strictly legal in nature; and (3) eliminating the reporting requirement, primarily because of administrative costs.
The original petitioners generally approve the Commission’s plan; however, they suggest that: (1) standards for pro bono services should be increased to fifty hours; (2) in lieu of the alternative payment of $350, an hourly rate of thirty dollars for all hours not performed should be charged; and (3) rather than having the chief judge of each circuit file his or her report with The Florida Bar, the reports should be filed with the Supreme Court, with The Florida Bar having an opportunity to file commentary. *259 In response to The Florida Bar’s suggestion that reporting not be required, Petitioners believe “the reporting requirement lies at the heart of this joint commission proposal” and state that the Commission’s suggested format is reasonable and should be implemented. Petitioners emphasize that the automatic review aspect of the report is important to allow the Court to directly assess the availability of legal services to the poor after this plan has been implemented. Similarly, the Projects Directors’ Association, representing Legal Services Offices, recommends forty-eight hours per year as the pro bono standard and a thirty-dollar-per-hour opt-out provision.
Other responses oppose the Commission’s recommendations. Professor Joseph Little asserts that the Commission’s report includes no study designed to make a defensible investigation of the true dimensions of unmet legal needs of the poor; that the $350 opt-out plan is unconstitutional because it would be a tax; and that the judiciary should not be the chief planner and implementer in providing a legal services program. Harvey M. Alper objects to any activity by the Court in this particular area and asserts that charity by definition cannot be compelled and that the adoption of this plan will destroy more than it will generate in services to the poor. Jerry A. DeVane believes that the proposed minimum standards of voluntary pro bono service make such service mandatory. He also objects to lawyers being able to collectively satisfy their pro bono requirement. Henry Trawick asserts that the Commission’s report is based on assumption, hearsay, and inadequate investigation, and that this Court is not vested with jurisdiction to provide for the general welfare.
In re Amends. to Rules Reg. Fla. Bar 1-3.1(a) & Rules of Jud. Admin. 2.065 (Legal Aid), 598 So.2d 41, 41-42 (Fla.1992). The diversity of views is striking, particularly because some of the same views, from some of the same people, still endure over two decades later.
This Court ultimately rejected the call for the mandatory obligation to provide legal aid services or to contribute $350, over the dissent of Justices Barkett and Kogan. Id. at 44. For his part, Justice Kogan eloquently observed:
In a very real sense, the present case involves many more people than just the privileged group of lawyers, legal scholars, and Bar officers who actually prepared and argued this cause. The people most seriously affected by this Court’s actions today are precisely the ones who were not present — the people who can least afford an attorney and thus can ill afford to appear before us to argue their side of this issue. These are the people that, because of the economic realities of our legal system, effectively have been excluded from the same level of legal services available to the more affluent residents of Florida.
These dispossessed people are everywhere in our society. They include the abused, neglected, or abandoned children who too often become mere pawns of a legal process they certainly lack the skills to comprehend. They include the divorcing wife systematically denied a voice in a legal system that too often favors the divorcing husband’s interests, because he too often is the one who' holds the purse strings. They include the impoverished minorities unable to find legal representation because they are unable to pay even the most minimal fees charged by lawyers. They include the elderly on fixed incomes who cannot afford the cost of the legal services they need — even simple services such as planning for illness or drafting a will. *260 The dispossessed' include the mentally and ■ physically ■ disabled, whose conditions often have stripped them of the wherewithal necessary to obtain legal advice.
Id. at 56 (Kogan, J., concurring in part and dissenting in part) (footnotes omitted). And, as Justice Barkett opined in advocating for mandatory pro bono services:
[T]he requirements of pro bono services derive from the status of lawyers as officers of the court and from the exclusive nature of the franchise they hold. I. do not perceive the requirement as deriving from a moral obligation to “do . good.” As much as I would like to harness the tremendous energy and resources. of lawyers — individually and collectively — to address the social and economic ills of this country, I do not believe that can be mandated. I do believe, however, for all the reasons so eloquently stated by Justice Kogan, that mandating legal representation for the indigent in order to assure .meaningful access to the courts can and should be.
Id. at 55 (Barkett, J., concurring in part and dissenting in part).
In 1993, though still not mandating pro bono hours, this Court finally adopted the requirement that there be mandatory reporting' of pro bono services and contributions, reasoning:
The authority and responsibility of this Court to adopt rules on the issue of pro bono legal services to the poor under our constitutional rule-making and administrative authority has been fully addressed in prior opinions. We need not readdress that issue here. We do reiterate, however, that this Court, as the administrative head of the judicial branch, has the responsibility to ensure that access to the courts is provided for all segments of our society. Given the number of reports presented to this Court that document the legal needs of the poor, we find it necessary to implement the attached rules. Justice is not truly justice if only the rich can afford counsel and gain access to the courts. Consequently, these rules are being implemented in the hopes that they will act as a motivating force for the provision of legal services to the poor by the members of this state’s legal profession.
Amends, to Rules Reg. Fla. Bar — 1-3.1(a) & Rules ofJud. Admin. 2.065 (Legal Aid), 630 So.2d 501, 502 (Fla.1993) (footnotes omitted). We explained the need for this mandatory reporting requirement as follows:
[W]e do expect members of the Bar, through the simplified report form that will be made a part of the annual dues statement, to report how they have assisted in addressing the legal needs of the poor. We believe that accurate reporting is' essential for evaluating this program and for determining what services, are being provided under the pro- , gram. This, in turn, will allow us to determine the areas in which the legal needs of the poor are or are not being met. Because we find that reporting is essential, failure to report will constitute an offense subject to discipline.
Id. at 502-03.
Since 1993, no further steps have been taken by the Bar to increase the amount of pro bono hours or to consider the imposition of any other mandatory obligations. Instead, in 1997, the Bar actually petitioned this Court to eliminate the mandatory annual reporting requirement, arguing that even that obligation should be voluntary. We rejected the Bar’s petition:
As the opponents of the amendment point out, there have been no fundamental changes in the circumstances surrounding this issue since the Court first determined that accurate reporting is *261 essential for evaluating the delivery of legal services to the poor and for determining where such services are not being provided. There is no more effective way to gauge the success of lawyers in meeting their obligation to represent the poor — an obligation every member of the Bar swears to undertake.
Lawyers have been granted a special boon by the State of Florida — they in effect have a monopoly, on the public justice system. In return* lawyers are ethically bound to help the State’s poor gain access to that system. The mandatory reporting requirement is essential to guaranteeing that lawyers, do their part to provide equal justice.
Amends, to Rule 1-6.1 of Rules Reg. Fla. Bar — Pro Bono Pub. Serv., 696 So.2d 734, '735 .(Fla.1997).
That brings us to today, almost two decades later, when once again the issue has been presented to this Court through a petition filed by exemplary members of The Florida Bar, rather than by the Bar itself, "which opposes any'increase fin the annual dues to fund legal aid services. But as the history of this issue demonstrates, going forward, it is essential that the Bar play a leading role in solving the current crisis.
As this Court has previously noted, “this is not a problem with a simple solution,” but “a solution is necessary if our justice system is to be accessible for all segments of society.” In re Amends, to Rules Reg. Fla. Bar, 598 So.2d at 42. Because of “the unique and important role” ■ lawyers play “in protecting individual rights,” id., the Bar must work diligently to ensure that equal access to justice is a reality for all Floridians, rather than simply an aspiration.
III.
In conclusion, I join the majority in rejecting the petition at this time because it does not require the Bar to raise the annual dues and the Bar has unanimously opposed the petition. I urge, however, that the Bar work with the Petitioners to find solutions to the current crisis while the Commission on Access to Civil Justice undertakes its diligent work, including consideration of increasing the number of pro bono hours or the amount of money contributed and consideration of making that a mandatory requirement, as advocated by Justices Barkett and Kogan.
While I am aware that the Bar has extended loan guarantees to the Florida Bar Foundation, I am confident that there are additional creative solutions to ensure that the valued employees of legal aid organizations can continue their work and that 'the bleeding of these essential services does not continue unabated. We can and we must do more — now. Finally, I once again thank our Chief Justice for being on the front lines of providing the necessary leadership, never missing an opportunity to advocate and promote public awareness of this critical issue.
LABARGA, C.J., concurs.

. Article I, section 21, of the Florida Constitution, provides: "The courts shall be open to every, person for redress of any injury, and justice shall be administered without sale, denial or delay.”

. California, for example, requires active Bar members to pay an annual fee of $430, as compared to Florida’s current $265 fee. See Rules of State Bar of Cal., App. A: Schedule of Charges & Deadlines (2015). Although fees vary nationwide, at least three states— Alaska, New Hampshire, and Oregon — have fees upwards of $500 yearly, which is nearly double the amount paid by Florida lawyers.