402 So.2d 389 (1981)
In the Matter of INTEREST ON TRUST ACCOUNTS.
Nos. 51182, 60350 and 60351.
Supreme Court of Florida.
July 16, 1981.
Rehearing Denied, Opinion Clarified August 5, 1981.
Russell Carlisle, President, Florida Bar Foundation, Fort Lauderdale, and Henry G. Zapruder of Cohen & Uretz, Washington, D.C., on behalf of the Florida Bar Foundation, Inc. and sixty-seven active members of The Florida Bar.
John F. Harkness, Jr., Executive Director, Tallahassee, Leonard H. Gilbert, President, Tampa, Samuel S. Smith, President-elect, Miami Beach, and John A. Boggs, Asst. Staff Counsel, Tallahassee, of The Florida Bar, Bill Wagner of Wagner, Cunningham, Vaughan and McLaughlin, Tampa, Chairman for the Florida Bar Integration Rule and Bylaws Committee, and Ben H. Wilkinson, Chairman, Special Committee, Tallahassee, on behalf of the Board of Governors of The Florida Bar.
Roderick N. Petrey and Randall C. Berg, Jr. of the Florida Justice Institute, Inc., Miami, on behalf of: American Civil Liberties Union, Common Cause of Florida, Florida Audubon Society, Florida Clearinghouse on Criminal Justice, Florida Conference of NAACP Branches, Florida Institutional Legal Services, Inc., Florida Legal Services, Inc., Florida Public Defender Association, Governor's Commission on Advocacy for Persons With Developmental Disabilities, Project Directors' Association, Southern Christian Leadership Conference, and Southern Legal Counsel, Inc.
Sara-Ann Determan, Chairperson, Special Committee on Public Interest Practice, Washington, D.C., on behalf of: the American Bar Association.
L. Orin Slagle, Dean, Florida State University College of Law, Tallahassee, on behalf of: Florida State University College of Law, the University of Florida, Spessard L. Holland Law Center, Nova University for the Study of Law, and Stetson University College of Law.
Robert M. Curtis, Fort Lauderdale, Henry P. Trawick, Jr., Sarasota, and Gerald L. Brown, Pensacola, Responding to Petition.
ENGLAND, Justice.
This proceeding emerges from the Court's 1978 program designed to generate interest on lawyers' trust accounts for the improvement of the administration of justice in Florida.[1] The original plan, permitting voluntary participation by lawyers and law firms, was once amended to meet technical requirements of the Internal Revenue Service (IRS) and to accommodate The Florida Bar's request that we remove a requirement that compliance certificates be prepared for attorneys by certified public accountants.[2] Notwithstanding these alterations, the program has never been implemented for its intended purposes due to delays in resolving with IRS the appropriate federal income tax treatment of the earnings, payable to the Florida Bar Foundation, Inc., to be generated on clients' funds held in lawyers' accounts.
Representing that tax considerations could be favorably resolved with IRS by a minor amendment to the program, the Foundation, joined by the Bar, has proposed amendments to the program for that purpose. In doing so, the Foundation has also asked that the program be made mandatory for all Florida attorneys, a position made possible by recent changes in the banking laws. In light of the latter proposal, the Foundation asked that we announce the changes and solicit comments from all interested parties. Promptly after the change proposals were submitted we did just that, simultaneously suspending the original program until further order of the *390 Court.[3] We have received responses and comments on the Foundation's proposals in abundance, and spirited oral argument was held on June 2.

I
The response to our request for comments was an outpouring of mail and filings, predominantly hostile to the proposed changes.[4] In addition to communications from the Foundation explaining the changes proposed, and from the Bar (presenting a catalogue of unanswered concerns), we have heard from attorneys, law firms, bar associations, bar committees, law schools, the Florida Bankers' Association, and various public interest law organizations. All these materials have been extremely helpful to us. They properly and candidly raise moral, legal and practical problems that inhere in the Foundation's proposals, and they express the sentiments of many attorneys, both on their own behalf and on behalf of their clients generally.
Interestingly, the federal problems which necessitated submission of program changes attracted almost no interest from those who communicated with us. Some concern was expressed about the uncertainty and vagueness of the terms which IRS deems essential to describe the categories of clients' funds brought within the ambit of this trust account program  those "held for a short period of time" or "nominal in amount." But those concerns present neither an impediment to the adoption of a revised program nor an occasion for more specificity, for the plan we adopted in 1978 always contemplated precisely the same "nominal" and "short" standards, which have classicly and historically governed attorneys in their trust account practices.[5]
Changes which are said to be necessary to make the program acceptable to IRS revolve around the federal income tax concept known to tax practitioners as the "assignment of income" doctrine. That doctrine, which is an outgrowth of a graduated, federal income tax rate structure, was first articulated in Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930). It evolved to prevent persons who generate income by their services or with their property from shifting that income to other persons in whose hands the income either would not be taxed or would be taxed at significantly lower rates. Classic income assignment situations involve conscious, tax avoidance schemes by taxpayers in high income brackets. Over the years the common elements of prohibited income assignment have been a tax avoidance motive and a scheme or device for shifting income to related or controlled taxpayers. See, e.g., United States v. Basye, 410 U.S. 441, 93 S.Ct. 1080, 35 L.Ed.2d 412 (1973); Commissioner v. First Security Bank of Utah, 405 U.S. 394, 92 S.Ct. 1085, 31 L.Ed.2d 318 (1972); Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940); Poe v. Seaborn, 282 U.S. 101, 51 S.Ct. 58, 75 L.Ed. 239 (1930).
In its efforts to enforce the tax laws and prevent erosion of the nation's tax base, the Internal Revenue Service has always been wary of plans with tax connotations which, although not designed for tax avoidance, might create precedent capable of being used for that purpose. Thus, any tax-shifting proposal submitted to IRS for approval invariably receives special scrutiny, not only for its motivations but as well for any incidental or implicit precedential potential.
This Court's 1978 program for the generation of income on client's accounts, seen by IRS as involving a conceptual reassignment of interest income from clients to the Foundation, raised concerns within IRS that the *391 program could become a breeding ground for yet unborn tax avoidance schemes. As a result, hesitancy existed to approve taxability to the Foundation of the interest generated on lawyers' commingled trust accounts. IRS acknowledged that, unlike all prior, prohibited assignment of income situations, the Court's program did not in any way involve taxpayer-initiated, tax evasion among related or controlled taxpayers. Indeed, it was noted that the Service had approved income transfer plans fraught with far more tax avoidance risk as precedent than the Court's program.[6] Nonetheless, the Service was slow to rule approvingly on the Court's program as originally adopted, and because the feasibility of implementing the program depended upon the earned income on trust accounts being treated as taxable to the Foundation rather than to individual clients, the withholding of approval effectively barred implementation of the program.
Eventually, tax counsel was able to obtain firm assurances from IRS that the tax treatment being sought for the program would be approved so long as clients could in no way and to no degree control the creation or destiny of earnings generated on their attorney-held funds.[7] The linchpin of approval was removal of all client control over the placement or non-placement of funds at interest  that is, elimination of the client's veto over the investment of funds from which he could never benefit because the amounts on deposit were either too small in amount or to be held for only a short duration. On the basis of IRS' proposal for approval, and despite the continued belief by the Foundation's tax counsel both that no client "income" ever existed under the program and that the principles of Lucas v. Earl were in no wise implicated, the Foundation proposed that we amend the program to eliminate all client control and, in the process, reaffirm the "nominal in amount" and "short in time" standards for program applicability. This we now do.
But it was not the tax aspects of the Foundation's proposal which raised the brouhaha which attended its submission to the Court. The Foundation's other proposal  that the program be converted from a voluntary to a mandatory plan  has evoked the most vehement response from bar members. The range of comments on this point run from respectful disagreement to hyberbolic outrage.[8] Specific objections can be categorized as concerns that the Foundation's revised program will have these effects:
1. burden attorneys with new record-keeping responsibilities and costs;

*392 2. be unfair to clients, or deprive them of their earnings;
3. adversely affect (or some say, further erode) the public image of the legal profession;
4. generate potential disciplinary problems for attorneys, due to the absence of specific guidelines or standards for handling clients' accounts;
5. produce undetermined effects on professional liability insurance premiums;
6. discriminate unfairly, because NOW accounts are not available to incorporated attorneys under current banking regulations;
7. require that attorneys monitor compliance with the payment and reporting requirements of financial institutions;
8. essentially mandate contributions from attorneys to the Foundation, since commingled trust accounts contain unearned legal fees and fees which have been earned but not yet withdrawn;
9. interfere with traditional attorney-client relationships, whether no explanation is made to clients concerning the use of account earnings (thus creating a conflict of interest between client and the Foundation), or whether an explanation is offered (thus choosing, in effect, the Foundation as the charity to which the proceeds of the client's fund will be paid);
10. interfere with attorney-banker relations, to the point that a change of institutions would be required in cases where banks do not pay interest on demand accounts;
11. confiscate clients' funds, in violation of the "taking" provisions of the federal Constitution[9] (noting Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (U.S. 1980));
12. increase clients' demands for more individual, interest-bearing accounts; and
13. discourage placing any funds in escrow with attorneys.
In addition to this plethora of concerns, we have been peppered with euphemisms ranging from declarations of the most current principles of Republicanism ("justices, too, read the election returns") to restatements of the traditions of an early frontier era ("leave us alone"). It has been suggested that the Foundation's proposal is not only outside our constitutional authority, being a legislative function (taxation), but is unconstitutional (taxation without representation, among other reasons), is unwarranted (because some attorneys can now get interest for their clients on their individual accounts), is unwise (because the Foundation is selected as sole recipient of any earnings which are generated), and is unjust (bankers complain that they cannot even earn interest on their own funds which are escrowed with attorneys). And as if these were not sufficient concerns for our ingestion, we have been told that the Foundation's proposals involve so many unresolved problems  such as uncertainty in application to Florida attorneys who practice out of the state or to multistate law firms, unrepresentativeness of the Foundation's currently authorized governing board, and uncertainty as to the treatment of service charges from financial institutions  that the only sensible thing to do is to appoint a study committee to examine the matter further.
Quite obviously, the Foundation's proposal has struck a nerve in the legal profession, and the focus of pain is the mandatory nature of the proposal. The original idea of creating a program of this type brought some negative views, but no comparable outcry attended the initiation and development of our original, voluntary program.
We cannot ignore the response of our bar. Indeed, we requested comments and criticisms precisely because we did not deign ourselves capable of discerning all possible *393 problems, legal and practical, or all reasonable objections to the Foundation's proposal.
In its persistently careful effort to bring about a trust account interest program which can at last see the light of day, the Foundation has filed a response with the Court which has met virtually every legitimate concern and problem with either an answer, an accommodation, or an acknowledgment of the difficulties. It urges us, nonetheless, not to send the program back into studied oblivion.[10] On this point we are in complete accord with the Foundation. The time has come either to implement this concept, or to scrap it. We choose to implement.[11] In attempting to do so, of course, we have carefully confronted the responsible concerns of the program's philosophical opponents and friends, as described below. But first, a note of frustrated fatalism is clearly in order.
If we have failed in any constitutional or tax sense to resolve the obstacles to implementation, and we do not believe that we have, it appears to us that we have done our best and should end our labors here. Thus, if we are further forestalled from advancing the public good through the program outlined below, it seems to us that the program will simply have to be written off as one of those good ideas whose time has not yet come. Our decision today, subject only to any technical difficulties properly and promptly brought to our attention, is our last endeavor in this field.

II
Two dominating considerations shape our implementation methodology. First, we acknowledge that the banking laws in Florida today are not what they were in 1978, and that the changes are sufficiently profound as to warrant reconsideration of the original plan. Second, the public and institutional responses we have received underscore what we earlier knew in approving a voluntary plan; namely, that Florida is not wholly like the provinces and countries which have implemented trust account interest programs in the homogeneity of its banking institutions,[12] in the centralization of its attorney populace, or in the forms of governmental control exercised over its legal profession.[13]
In addition to these matters, a new consideration which affects the program in light of the Foundation's request that we make it make it mandatory is the Supreme Court's 1980 decision in Webb's Fabulous Pharmacies, Inc. v. Beckwith. That consideration is whether the earnings on clients' funds are "property" of the clients which constitutionally cannot be taken from them without compensation. The dictates of the fifth and fourteenth amendments to the United States Constitution, as articulated in Webb's, obviously cannot be ignored in framing any program involving a state-directed use of income generated on private funds.

III
Taking all factors into account, we adopt these concepts for a voluntary program designed to generate interest on lawyers' trust accounts, effective as of September 1 unless modified by intervening order the Court:
(1) We now reaffirm the goals of our 1978 program, including the payment of interest under the program to the Florida Bar Foundation, Inc., and we reaffirm our commitment to their accomplishment with all possible speed.
(2) We now reaffirm our initial decision that interest be made available under the program only on a voluntary basis  that is, *394 on the basis of willing participation by attorneys and law firms, whether proprietorships, partnerships, or professional corporations.
(3) We accede to the concerns of IRS with regard to a possible erosion of the "assignment of income" doctrine, and we direct the application of this program to all clients of electing, participating attorneys or firms whose funds on deposit are either nominal in amount or to be held for a short period of time.[14]
(4) We reaffirm these cardinal principles concerning clients' funds held in trust accounts by attorneys and firms who elect NOT to participate in the program:
(a) no earnings from the funds may be made available to the attorneys or firms;[15]
(b) upon request of a client, earnings may be made available to the client whenever possible on deposited funds which are neither nominal in amount nor to be held for a short period of time;[16] provided however, inasmuch as traditional attorney-client relationships do not compel attorneys either to invest clients' funds or to advise clients to make their funds productive, no charge of ethical impropriety or other breach of professional conduct shall attend a failure to invest or to advise of the possibility of investing clients' funds of whatever amount or duration held;[17]
(c) clients' funds which are nominal in amount or to be held for a short period of time, and for which individual income generation and allocation is not arranged with a financial institution, must be retained in a non-interest bearing, demand trust account; and
(d) the determination of whether a client's funds are nominal in amount or to be held for a short period of time rests exclusively in the sound judgment of each attorney or law firm, just as it has from time immemorial, and no charge of ethical impropriety or other breach of professional conduct shall attend an attorney's exercise of judgment in that regard.
(5) We reaffirm these principles concerning clients' funds which are held by attorneys and firms who elect TO participate in the program:
(a) no earnings from the funds may be made available to the attorneys or firms;
(b) upon request of a client, earnings may be made available to the client whenever possible on deposited funds which are neither nominal in amount nor to be held for a short period of time; provided however, inasmuch as traditional attorney-client relationships do not compel attorneys either to invest clients' funds or to advise clients to make their funds productive, no charge of ethical impropriety or other breach of professional conduct shall attend a failure to invest or to advise of the possibility of investing clients' funds of whatever amount or duration held;[18]
(c) clients' funds which are nominal in amount or to be held for a short period of time shall be retained in an interest bearing checking or savings trust account, with the interest (net of any service charges or fees) made payable to the Florida Bar Foundation, Inc., and
(d) the determination of whether a clients' funds are nominal in amount or to be held for a short period of time rests exclusively in the sound judgment of each attorney or law firm, and no charge of ethical impropriety or other breach of professional conduct shall attend an attorney's exercise of judgment in that regard.
*395 (6) We reject the Foundation's proposals for mediating claims against attorneys.[19]
(7) We note and approve the Bar's withdrawal of its proposed addition of a new paragraph (f) to Integration Rule 11.02(4).[20]
(8) We remove as unnecessary under current banking laws those provisions of our original program which were designed to assure the immediate availability of clients' funds held at interest.[21]
(9) We remove the notice requirement provisions of our original program.[22]
(10) We now reaffirm the general, governing principles for implementation of a trust account program which are set forth in paragraphs 1 through 5 of section VIII of our original opinion.[23]

IV
We envision extensive participation by lawyers and law firms in this voluntary program. We have deliberately made the program simple and inexpensive by: (i) omitting any burdensome or costly accounting and record-keeping requirements; (ii) approving and continuing traditional attorney-client relationships and responsibilities; (iii) approving and continuing existing practical and ethical procedures concerning either the investments of clients' funds or investment advice, including the abolition of any requirement that clients be notified of the program; and (iv) providing that the Foundation shall absorb any financial institution's special charges or fees for participation in the program, by directing that interest payments shall be net of such charges and fees.
With respect to constitutional concerns regarding the program, we see none that bars implementation. There are many distinguishing features between the program today implemented for the generation of interest on lawyers' trust accounts, and the legal requirements of state law which led the United States Supreme Court to invoke the fifth amendment "taking" clause for the protection of private property in its Webb's decision. The most relevant distinction, plainly, is the fact that no client is compelled to part with "property" by reason of a state directive, since the program creates income where there had been none before, and the income thus created would never benefit the client under any set of circumstances. We know from Webb's, 101 S.Ct. at 450, that
[p]roperty interests ... are not created by the constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law... .
*396 It follows that no client has a "property interest," in the constitutional sense, which is being taken from him by this program.
Of course, another vast difference from Webb's is the voluntary nature of this program, for the program today approved is not abusive of the rights, interests or funds of clients. It is volitional not only from the perspective of attorneys but, in the most practical sense, from the will of clients, for no attorney or firm will participate in the program in the face of a strenuous objection from its clients. Nor should Florida attorneys jeopardize clients or client relations by dogmatically insisting on participation in the program in the face of announced opposition of a serious nature. We doubt that client concerns will prohibit broad participation in the program, however, since only clients with nominal funds or those to be held for short durations  that is, clients who cannot themselves benefit from investing  are in effect providing the pooled income source. In this sense of client acquiescence to program participation, any argument based on the "taking" aspect of Webb's is attenuated beyond tenability.
We reiterate that notification to clients whose funds are nominal in amount or to be held for a short period of time is unnecessary for those attorneys and firms who choose to participate in the program. That is not to suggest that many will not want to notify their clients of their participation in the program in some fashion. Plainly, there is no impropriety in an attorney or firm advising all clients of their willingness to advance the administration of justice in Florida beyond their individual abilities and in conjunction with other public-spirited members of their profession. But participation in the program will involve no more than an affirmative desire to participate, coupled with the attorney's or firm's communication of that desire to an authorized financial institution. That communique should contain only an expression of the attorney's or firm's desire to participate in the program and, if the institution has not already received appropriate notification, advice regarding IRS' approval of the taxability of earned interest or dividends to the Foundation.[24]
We urge the Bar to encourage participation in this program, and in furtherance of that end to assist Florida financial institutions and Florida attorneys with as much information and aid as may be necessary to establish and maintain simple and inexpensive compliance procedures. The foremost objective of our 1978 program was to enhance the capability of the legal profession to deliver legal services to the poor.[25] The broad delivery of legal services has long been a cherished commitment of this Court.[26] At a time in this nation when existing governmental resources for this purpose are drastically threatened,[27] our revisitation to this program provides a propitious occasion to reemphasize our commitment and to revalidate our methodology.
We urge all Florida lawyers who are able to participate in the program to do so. We trust they will follow the example of the Foundation's leaders, whose perseverance and patience has marked the road toward an expanded access to justice throughout our state.[28]
The following, revised provisions of Rule 11.04(d) are hereby adopted, effective on *397 September 1, 1981, unless modified by intervening order of this Court.
It is so ordered.
SUNDBERG, C.J., and OVERTON, ALDERMAN and McDONALD, JJ., concur.
BOYD, J., dissents with an opinion.
ADKINS, J., dissents.

Integration Rule 11.02(4)(d)

(strike-throughs indicate deleted material; underscoring indicates added material.)
(d) Interest-bearing Trust Savings Accounts. A member of The Florida Bar who elects to create or maintain an interest-bearing trust a trust savings account for clients' funds which are nominal in amount or to be held for a short period of time shall comply with the following provisions:
(i) A trust savings An interest-bearing trust account may be established with any bank or savings and loan association authorized by federal or state law to do business in Florida and insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation. Funds in each interest-bearing trust account shall be subject to withdrawal upon request and without delay.
(ii) Except as otherwise required by law, funds in each trust savings account shall be subject to withdrawal, or to transfer to a trust checking account, upon request and without delay. Any depository institution permitted by law to require advance notification (30 or 60 days) before allowing withdrawal of savings deposits is nonetheless eligible to act as a depository for trust savings accounts under this rule if it meets the requirements of paragraph (i) above, provided the institution has not acted to delay the withdrawal of deposited funds (other than for the clearance of deposited deposited funds or for good cause attributable to the circumstances of the particular depositor rather than the institution's financial needs or general policy) at any time during the past five years. An otherwise qualified institution which has not been in existence for five full years may serve as a trust savings account depository if it has met the requirements of this subsection throughout its existence.
(iii) An institution shall cease to be eligible for the receipt of trust savings funds at such time as it fails to qualify under paragraphs (i) or (ii). Any lawyer or law firm maintaining a trust savings account against which immediate withdrawal rights are refused shall immediately notify the Florida Bar Foundation, Inc. of the name and address of the depository institution and the date of such refusal.
(iv) If, pursuant to governing law or banking regulations, a depository institution requires notice in writing for an intended withdrawal not less than 30 days before such withdrawal is made, the lawyer or law firm may certify to The Florida Bar Foundation, Inc. that the client's funds detained as a result of the depository institution's notification requirement are needed immediately for the client's affairs.
(A) Upon receiving such certification, the Foundation shall be authorized to advance to the certifying lawyer or law firm, from the interest earned on trust savings accounts, an amount of money necessary to meet the client's emergency needs subject, however, to limitations expressed in subparagraph (C).
(B) Simultaneously with certification, the lawyer or law firm shall direct the depository institution in writing, with a copy to the Foundation, that upon the expiration of the notification period detained funds equal to the amount advanced by the Foundation shall be remitted directly to the Foundation.
(C) The Board of Directors of the Foundation may adopt rules of procedure reasonably necessary to implement the authority provided in subparagraph (A) and to assure full reimbursement of sums advanced. Periodically the Board may set dollar limitations on the amount of money which may be advanced to meet the emergency needs of any client in the event a notification requirement is imposed by a depository institution.
*398 (ii) (v) The rate of interest payable on any interest-bearing trust savings account shall not be less than the rate paid by the depository institution to regular, non-attorney savings depositors. Higher rates offered by the institution to customers whose deposits exceed certain time or quantity minima, such as those offered in the form of certificates of deposit, may be obtained by a lawyer or law firm on some or all of deposited funds so long as there is no impairment of the right to withdraw or transfer principal immediately. (except as accounts generally may be subject to statutory notification requirements), even though interest may be sacrificed thereby.
(iii) (vi) Lawyers or law firms electing to deposit client funds in a trust savings account shall direct the depository institution:
(A) to remit interest or dividends, as the case may be, on the average monthly balance in the account, at least quarterly, to the Florida Bar Foundation, Inc.;
(B) to transmit with each remittance to the Foundation a statement showing the name of the lawyer or law firm for whom the remittance is sent and the rate of interest applied; and
(C) to transmit to the depositing lawyer or law firm at the same time a report showing the amount paid to the Foundation, the rate of interest applied, and the average account balance for each month of the period for which the report is made., and any remittances to the Foundation made during that period pursuant to subparagraph (iv) (B).
(vii) Lawyers and law firms electing to deposit client funds in a trust savings account shall transmit to each client for whom trust funds are now held, and to each new client for whom funds are to be held, a copy of the notice reproduced below. The Florida Bar shall print and maintain a supply of this notice, and distribute copies without charge to those who may request them. The Bar's costs for printing and distribution shall be treated as a cost of administering the program, and shall be reimbursed to the Bar by the Foundation from interest earned on trust accounts.

Important Notice to Clients
For your protection, the Florida Supreme Court requires that all funds of a client which are held by an attorney must be deposited in a trust account separate from the attorney's, and must be kept available for immediate withdrawal. Because most clients' funds which come into the hands of attorneys are relatively small in amount or are to be held for relatively short periods of time, it is impractical for attorneys to establish a separate account for each client or to invest each client's funds to earn interest. For this reason client funds are held in a common trust checking account on which the depository bank pays no interest.
Under a new program approved by the Florida Supreme Court, attorneys are now permitted to deposit clients' common trust funds in savings accounts. Due to the expense and complexity which would attend any attempt to compute or distribute the interest attributable to each client's funds, it is not feasible to pay to individual clients the earnings on their proportionate share of common trust savings accounts. Of course, no attorney is permitted to receive the earnings on a client's funds, either. Rather under the Supreme Court's new directive, the interest income from clients' deposits will be used to fund programs designed to benefit the general public.
The goals of the Court's program are to improve the administration of justice in this state and to expand the delivery of legal services to the poor.
We have sent you this explanation, at the direction of the Florida Supreme Court, to advise you that we are participating in the Court's new program and that the funds you have entrusted to us for your affairs (other than attorneys' fees) will be deposited in an interest bearing trust savings account unless you specifically give us written instructions to the contrary. A directive not to allow such use of your funds will not produce income for your. Your funds will simply be placed in a non-interest-bearing trust checking account until needed.
BOYD, Justice, dissenting.
I concurred in the opinion of the Court when we originally decided to attempt to fund the Florida Bar Foundation with interest earned on lawyers' trust accounts. In re Interest on Trust Accounts, 356 So.2d 799 (Fla. 1978). In view of the difficulties that have delayed the implementation of the program, however, I have approached the instant rule-amendment proceeding with an open mind on the question whether "to implement this concept," to study it further, "or to scrap it." Opinion of the Court at 8. While the objective sought to *399 be achieved by the plan  the funding of the Florida Bar Foundation  is highly commendable, the serious unresolved problems brought to our attention by the many members of the Bar who participated in this proceeding compel me to withhold my approval.
Unlike the majority, I find that a significant number of the responses we received did raise questions about the "assignment of income" problem. While not discussing the problem in the technical language of the tax practitioner, many lawyers expressed a strong, common-sense feeling that income earned from the investment of trust funds simply must be deemed in the first instance to be the property of the owners of the funds. Some lawyers expressed concern that the Internal Revenue Service will treat such income as taxable to the owners. Without a requirement for notice to clients of the investment of their funds, some attorneys are worried that such clients may be charged income they never knew they received.
The majority opinion discusses the resolution of the problems of income assignment and taxability without documenting the statements made regarding the approval or assurances of the Internal Revenue Service. Unless we receive a definitive and binding ruling from the Service regarding the tax liability of the owners of trust funds, the attorneys entrusted with them, and the Foundation, it is unwise to implement the plan.
The same common-sense considerations that prompt concern on the question of who will be deemed to earn the income generated by clients' funds leads some members of our Bar to question whether the channeling of the income to the Foundation without the actual consent of the trust fund owners violates the Fifth Amendment ban on deprivation of property without due process of law. I find merit to this argument.
The majority's answer to the "taking" argument is inadequate. The Court says that the program creates income where there was none before, so no property is actually taken from the owners of the trust funds. But the majority also recognizes that when trust funds are kept in non-interest-bearing accounts, the beneficiaries are the depository banks. The point is that there is almost always income from properly invested capital. If a lawyer keeps a client's funds in an office safe or in a shoe box, there is no income. But once deposited with a financial institution, the money, within the limits of the applicable banking laws and regulations, is put to work earning income. If the depository institution pays no interest to the depositor, the institution benefits financially. But if interest is paid, the depositor receives income. The majority acknowledges that it may now be possible for a financial institution to provide interest allocation for multiple depositors in single trust accounts, even though the individual clients' funds may be nominal in amount or to be held for a short period of time. Yet the Court still insists that to direct the income to the Foundation without notice to and consent of the owners does not affect their property interests. This is inconsistent.
I also believe that the lack of a requirement for actual notice to and consent of persons whose property will generate the income that is to fund the plan will create a conflict of interest between the Foundation and owners of the affected trust funds. Many protesting members of the Bar have argued that the lack of notice will also adversely affect the public image of the legal profession in Florida.
The plan adopted by the Court today will put grave pressures on the attorney-client relationship. While it is recognized in a most general sense that lawyers should hold trust funds that are greater than nominal in amount or to be held for more than a short period of time in interest-bearing accounts, it is left to the unfettered and unguided discretion of attorneys to decide whether a particular client's property meets these criteria. Despite the attempt to exonerate in advance a lawyer's decision on this matter that may eventually be shown not to have been in the client's best interest, I predict that controversies and charges of ethical impropriety will arise from lawyers' participation in the program.
I am sympathetic to the goals of the Florida Bar Foundation, and would be willing to concur in the result of the majority opinion were it not for the serious problems I have just discussed. But at the same time I have been deeply affected by the communications of protest we have received from many members of the Bar. I note in particular the letter of Mr. Jay H. Beckerman, who writes in part:
Any attorney or client who chooses ... to contribute to the Florida Bar Foundation, Inc., has been and should be free to do so. That foundation or any other *400 form of a charity or eleemosynary entity or purpose should be required to attract donations on its merits, and not be enriched by a funneling scheme with which the coerced donors do not agree and did not choose of their own free will.
With the plan for charitable use of interest on lawyers' trust accounts in its present posture, I must respectfully dissent.

ORDER OF CLARIFICATION
ENGLAND, Justice.
In accordance with our request that technical difficulties in the trust account program be brought to our attention promptly, The Florida Bar has filed a petition requesting two changes to the Integration Rule by which the program is implemented. The Bar advises us that not all depository institutions utilize an average monthly balance method for computing interest or dividends, and it requests that we modify Rules 11.02(4)(d)(iii)(A) and (C) appropriately. The Bar's request is granted, and the operative language of Rule 11.02(4)(d)(iii) which will become effective on September 1, 1981, as amended on July 16, 1981, is further amended to read:
(iii) (vi) Lawyers or law firms electing to deposit client funds in a trust savings account shall direct the depository institution:
(A) to remit interest or dividends, as the case may be, on the average monthly balance in the account or as otherwise computed in accordance with an institution's standard accounting practice, at least quarterly, to the Florida Bar Foundation, Inc.;
(B) to transmit with each remittance to the Foundation a statement showing the name of the lawyer or law firm for whom the remittance is sent and the rate of interest applied; and
(C) to transmit to the depositing lawyer or law firm at the same time a report showing the amount paid to the Foundation, the rate of interest applied, and the average account balance for each month of the period for which the report is made.
It is so ordered.
SUNDBERG, C.J., and ADKINS, BOYD, OVERTON, ALDERMAN and McDONALD, JJ., concur.
NOTES
[1] In re Interest on Trust Accounts, 356 So.2d 799 (Fla. 1978).
[2] Matter of Interest on Trust Accounts, 372 So.2d 67 (Fla. 1979).
[3] In the Matter of Interest on Trust Accounts, 396 So.2d 719 (Fla. 1981).
[4] Over sixty identical "form" letters expressing dissatisfaction with the program were filed from attorneys in the Dade County area. Most of these mailings appear to originate from small or one-man law firms. Not all communiques were adverse to the Foundation's proposals, however. Support for the changes come from four Florida law schools and from various public interest law committees and organizations.
[5] See 356 So.2d at 802 & n. 20, 804.
[6] Rev.Rul. 479, 1976-2 C.B. 20 (members of medical staff of hospital who assign right to receive income from teaching cases to research and educational foundation as a condition precedent to being member of staff not taxable on fees for treating teaching cases because they have "no control over the fees charged, or the collection and disbursement of such fees."); Rev.Rul. 274, 1969-1 C.B. 36 (faculty physicians of a medical school who provide medical services to indigent patients at a hospital are not required to include in their gross income fees collected and remitted to the university in accordance with university policy and agreement where "[u]nder this arrangement, no individual physician would ever have control of the funds collected.").
[7] Under the Court's original program, of course, clients could prevent the realization of income but they could not benefit from their action. No income would be earned for the Foundation if an individual client took affirmative steps to notify his attorney that he did not want income paid to the Foundation. In that case, the funds on deposit with the attorney would be placed in a non-interest bearing checking account from which no interest income would be generated. The client's choice, consequently, was a negative one, to prevent the creation of income, in the absence of which the Foundation would benefit. Tax counsel argued unsuccessfully to IRS that because clients with funds on deposit could in no way "realize" income in the tax sense, there was no transfer or shift of income among taxpayers, except in the conceptual sense that "income" would inhere on unearning deposits for the benefit of depository commercial banks.
[8] Many comments reflect a complete misunderstanding of the program's operation, the role of attorneys in its implementation, or the federal tax implications and tax return requirements of the program. In light of our action today, there is no need to correct those misapprehensions here.
[9] U.S.Const. amend. V.
[10] The notion of generating interest on lawyers' trust accounts in Florida began in 1971. In re Interest on Trust Accounts, 356 So.2d 799, 800 (Fla. 1978).
[11] Disagreement with the general wisdom of improving the administration of justice with the earnings on clients' funds, which runs through many of the adverse filings, has already been considered and resolved in our 1978 decision. Id. at 805-07. We refuse the invitation to turn back.
[12] 356 So.2d at 807 n. 44.
[13] Id. at 803-04 nn. 28-30.
[14] We have knowingly added the words "to be" as part of the temporal standard, rather than continue the former standard of time shortness in fact. The significance lies in allowing attorneys to test for shortness when the funds are received, and not require a hindsight reexamination based on duration in fact. We cannot require attorneys to be seers, and we see no value in allowing the program or any attorney to be jeopardized by an ex post facto audit.
[15] 356 So.2d at 800-01.
[16] Id. at 802 n. 20.
[17] Of course, a failure to comply with a client's investment directives may give rise to a legal liability for damages.
[18] See note 17, above.
[19] The rejected proposal was reproduced as new paragraphs (vii) and (viii) to Integration Rule 11.02(4)(d) in In the Matter of Interest on Trust Accounts, 396 So.2d 719, 722 (Fla. 1981).
[20] This proposal was also reproduced in the Court's opinion soliciting commentary. Id.
[21] Fla. Bar Integr.Rule, art. XI, Rule 11.02(4)(d)(ii)-(iv).
[22] Fla. Bar Integr.Rule, art. XI, Rule 11.02(4)(d)(vii).
[23] Those principles, as they appear in 356 So.2d at 807, are:

1. Implementation will be effected through the Integration Rule rather than through by-laws alone;
2. Interest earned on trust accounts will be remitted to the Foundation rather than the Bar, at least quarterly, for distribution among the agencies which will provide approved services;
3. Clients' trust funds may be invested in savings accounts of qualified financial institutions, but not in U.S. government or other securities;
4. No filing of any sort with the Bar will be required other than a certificate of annual compliance with minimum trust account procedures, and no accounting and record-keeping requirements shall be imposed on plan participants other than those minimum requirements expressed in the new rules;
5. In lieu of special name designations for attorney trust accounts, all accounts in which clients' funds are deposited will, as they are now, simply be identified as "trust accounts."
To avoid unforeseeable problems of rigidity, we authorize the Foundation to approve periodic remittances less frequently than quarterly from any participating financial institution which cannot feasibly, in accordance with its standard banking and accounting practices, remit interest payments to the Foundation at least quarterly.
[24] IRS approval is anticipated promptly upon our readoption of this program. The Bar and the Foundation can promptly communicate the details of approval, together with the Foundation's tax identification number, to Florida associations representing appropriate financial institutions.
[25] 356 So.2d at 811.
[26] Our most recent exhortation on the subject appears in The Florida Bar v. Furman, 376 So.2d 378, 381-82 (Fla. 1979).
[27] For example, continued funding for the Legal Services Corporation is a matter of intense debate in Washington, D.C.
[28] A special note of appreciation is in order for the efforts of Henry Zapruder, of the Washington law firm of Cohen and Uretz, whose skill and diligence as tax counsel to the Foundation has proved invaluable to the Foundation, to the Court, and to the citizens of Florida.