788 So.2d 958 (2001)
THE FLORIDA BAR, Complainant,
v.
Harold SILVER, Respondent.
No. SC00-689.
Supreme Court of Florida.
June 21, 2001.
*959 John F. Harkness, Jr., Executive Director, John Anthony Boggs, Division Director, and Edward Iturralde, Bar Counsel, Tallahassee, FL, for Complainant.
Douglas W. Abruzzo, Gainesville, FL, for Respondent.
PER CURIAM.
The respondent, Harold Silver, has petitioned for review of the referee's report regarding alleged ethical breaches and recommending a public reprimand. We have jurisdiction. See art. V, § 15, Fla. Const.
The Bar filed a complaint against Silver alleging that, in the handling and disbursement of certain settlement proceeds, he violated Rules of Professional Conduct 4-1.15 (safekeeping property) and 4-8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation) of the Rules Regulating the Florida Bar. After a hearing, the referee found as follows.

FACTS
Silver was retained on a contingency basis by Willie Pogue (Pogue) concerning an injury Pogue received in a laundromat, Wash King. Silver was also retained by Pogue on other cases, including two family law matters that were unrelated to the Wash King case. Silver secured a lien against the proceeds from the Wash King case for the hourly fees on the two family law cases.
Pogue received medical treatment from various medical providers for the injuries he sustained at Wash King. Silver sent several letters to one of these medical providers, Ramadan Hand Institute (Ramadan),[1] which stated that he would protect the doctors' bills after attorney's fees and costs were paid. In several of these letters, Silver attached a medical assignment signed by Pogue that authorized Silver to pay the medical facilities and doctors after payment of attorney's fees and costs. One of the letters of protection to Ramadan from Silver indicated that the hospital and doctor would be protected "so far as the money will go, after attorney fees and costs are paid."
On April 29, 1997, Silver received a check from Nationwide Insurance Company for general liability coverage ("medpay") made payable to Pogue in the amount of $3,937.58. With Pogue's approval and consent, Silver took $1,312.53 as a contingent fee and $1,027.28 for costs in the Wash King case, and applied the balance to attorney's fees in one of the family law cases. Silver did not notify any of the medical providers upon receipt of the medpay funds, did not deliver any of the medpay funds to the medical service providers, or otherwise protect the funds.
On September 10, 1998, Silver and Pogue signed a letter of protection entitled "Letter of Protection/Lien for Medical Services" prepared by Ramadan. Before returning the document, Silver added some language to the document by handwriting the words "and costs" after the words "attorney's fees" and typing an additional condition to the end of the paragraph.
On May 11, 1999, Pogue settled his Wash King personal injury case for $22,500. In order to accept the settlement, Pogue indicated to Silver that he needed to receive at least $6000 from the settlement. Silver told Pogue that he *960 would reduce his legal fees and attempt to negotiate with the medical providers for a reduction in their bills.
Due to the small settlement amount, Silver's office sent letters to most of Pogue's medical providers asking them to accept thirty cents per dollar in settlement of outstanding medical debts. One of these letters was sent to Dr. Osbourne "c/o Ramadan." Through Silver's inadvertence, a separate letter was not sent to Ramadan. Neither Dr. Osbourne nor Ramadan responded to the letter. Silver telephoned most of the medical providers that did not respond to his letter and was able to negotiate the amount of those medical bills. Silver, however, did not attempt to contact or negotiate with Ramadan or Dr. Osbourne by telephone.
According to Silver's accounting of the settlement funds, Silver reduced his fee to $6000, took $2,309.11 as costs, distributed $5,659.69 to medical providers, distributed $2000 to Mrs. Pogue for all claims concerning her divorce from Pogue, and distributed the balance, $6,331.20, to Pogue. Silver sent two checks for $1500 each to Ramadan and Dr. Osbourne. Ms. Emerson Webb, chief financial officer for Ramadan, initially refused the checks and demanded payment in full or an accounting.
Based on the above, the referee recommended that Silver be found guilty of violating rule 4-1.15.[2] In pertinent part, the referee elsewhere in the report makes factual findings relevant to a violation of this provision:
Silver certainly did not notify Ramadan of the existence of the medpay funds. Neither did Ramadan receive notice of the settlement until the funds were already distributed. The failure to send Ramadan a letter requesting a reduction in their bill may have been an office oversight, but it is one for which Silver is ultimately responsible. The evidence is also clear that Silver did not negotiate with Ramadan and Dr. Osbourne for an agreed reduction in their fees as he did with the other medical providers, and the funds were distributed by Silver, with his client's acquiescence, without taking the matter to an independent third party for review. Silver argued that his contract with Pogue gave him a superior lien to the funds. While this may or may not be the case, it was not for Silver to unilaterally make such a decision. The matter should have been placed before a court of competent jurisdiction for a decision as to how the funds should be appropriately distributed.
As to discipline, the referee recommended that Silver be publicly reprimanded. In mitigation, the referee found: lack of a disciplinary record, absence of a dishonest or selfish motive, absence of fraud or intent to deceive, and Silver's cooperative attitude toward the proceedings. In aggravation, the referee found: Silver's refusal to acknowledge the wrongful nature of his conduct[3] and Silver's substantial experience in the practice of law (almost 28 years).

ANALYSIS
*961 Under subdivision (b) of rule 4-1.15,[4] Silver had a duty, upon receiving funds in Pogue's personal injury case, to promptly notify persons with an interest in such funds. Ramadan and Dr. Osbourne had an interest in the personal injury funds based on the letters of protection. Thus, whether Silver is guilty of violating rule 4-1.15(b) depends on whether there is competent substantial evidence supporting the referee's findings that Silver failed to notify Ramadan and Dr. Osbourne of the medpay funds or that Silver failed to notify Ramadan of the settlement funds. See Florida Bar v. Jordan, 705 So.2d 1387, 1390 (Fla.1998) (stating that where such findings are adequately supported, "this Court is precluded from reweighing the evidence and substituting its judgment for that of the referee").
At the hearing, Silver testified that he did not notify Ramadan or any other health care provider that the medpay funds had been received.[5] Thus, there is competent substantial evidence supporting the referee's finding that Silver did not notify Ramadan or Dr. Osbourne of the medpay funds.[6] Therefore, Silver is guilty of violating rule 4-1.15(b) for failing to notify the medical providers of the medpay funds.
Although Silver argued at the hearing that the medpay funds were not his because the check was made payable only to Pogue, Silver had letters of protection and Pogue's medical assignment authorizing Silver to pay the medical providers after payment of attorney's fees and costs. Indeed, the very nature of medpay benefits is to provide for payment of medical bills.
Further, as to the settlement funds, Silver testified that his office sent a letter to all the medical providers except Ramadan.[7] Although Silver may not have intentionally failed to notify Ramadan of the settlement funds, intent is not a requirement under rule 4-1.15(b). In addition, Silver made follow-up calls to all the medical providers that did not respond to his letter except Ramadan and Dr. Osbourne. As such, Ramadan was not telephonically contacted to negotiate a reduction in its bill. Thus, there is competent substantial evidence supporting the referee's finding that Ramadan was never notified of the settlement funds until after the funds had been distributed. Therefore, this failure also constitutes a violation of rule 4-1.15(b).
As to discipline, generally speaking this Court "will not second-guess a referee's recommended discipline as long as that discipline has a reasonable basis in existing caselaw." Florida Bar v. Temmer, 753 So.2d 555, 558 (Fla.1999). In this case, the referee recommended a public reprimand. The Florida Standards For *962 Imposing Lawyer Sanctions provides in Standard 7.3 that a "Public Reprimand is appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system." In light of the violation found, there is no basis for imposing a lesser sanction.
What this Court stated in Florida Bar v. Wagner, 212 So.2d 770, 773 (Fla.1968), over thirty years ago rings true today:
A lawyer who undertakes to assert and collect a personal injury claim for a client ordinarily and necessarily deals with a number of persons and agencies other than his client and the adverse party. The attorney does not prosecute his client's claim in a vacuum. During the course of investigating and preparing his client's case, the attorney must necessarily seek out witnesses of various kinds. In particular, his quest for evidence ordinarily leads him to treating physicians, hospitals, drug stores, and other persons and agencies who have rendered medical services to his client. He must necessarily confer with such parties and in many cases he must call upon them for testimony or other evidence. In addition, the attorney is often required to enlist the aid of experts and other witnesses who have not rendered such services to the client.
The responsibilities of the attorney which arise as such relationships are established, and which come into focus upon the attorney's receipt of funds in settlement or payment of his client's claim, are not entirely defined and limited by the law of contracts. Quite apart from any legal duty on his part, the attorney has a professional duty to accomplish the disbursement of such funds in a matter which accords a proper regard and respect for the rights and legitimate expectations of his own creditors, as well as those of his client.
Wagner, 212 So.2d at 773.
Accordingly, Harold Silver is hereby publicly reprimanded by publication of this opinion. Judgment is entered for The Florida Bar, 650 Apalachee Parkway, Tallahassee, Florida 32399, for recovery of costs from Harold Silver in the amount of $3,843.06, for which sum let execution issue.[8]
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
NOTES
[1] Ramadan Hand Institute is a fictitious name of Medlink Management Services, Inc.
[2] The referee found that the Bar "failed to prove by clear and convincing evidence that [Silver] engaged in conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of Rule 4-8.4," and recommended that Silver be found not guilty of violating rule 4-8.4. The Bar does not contest this finding.
[3] The referee stated that "Silver does not acknowledge wrongful conduct in this case, however, I do not place great weight on this factor as I believe Silver thought he was behaving in the interest of his client."
[4] Rule 4-1.15(b) provides in full:

Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
[5] Silver testified that he received the medpay check at his office and, because it was made payable only to Pogue, he deposited it into his office account rather than a trust account. Although this appears to be a rule 4-1.15(a) violation for commingling client funds, the Bar did not allege such a violation. Also, the Bar did not charge a violation in connection with Silver's taking a full contingency fee on the medpay benefits.
[6] Silver admits this fact again in his review brief. See Initial Brief of Respondent at 3-4.
[7] Silver admits this fact again in his review brief. See Initial Brief of Respondent at 6.
[8] We do not find merit in any of the points raised by respondent attacking the award of costs. However, we note that although the referee awarded $4,053.06 in costs, this award included $210 in court clerk travel and expenses. There is no provision under rule 3-7.6(o)(1) for allowing for the court clerk's travel and expenses as taxable costs. Taxable costs are limited to those specified under the rule. See generally Florida Bar v. Chilton, 616 So.2d 449, 451 (Fla.1993).