# Supreme Court of Florida

_____

No. SC20-1543

_____

## IN RE: AMENDMENTS TO RULE REGULATING THE FLORIDA BAR 5-1.1(g).

June 18, 2021

PER CURIAM.

The Task Force on the Distribution of IOTA Funds (Task Force) petitions the Court to amend rule 5-1.1(g) (Trust Accounts; Interest on Trust Accounts (IOTA) Program) of the Rules Regulating the Florida Bar (Bar Rules). We have jurisdiction. *See* art. V, § 15, Fla. Const. With the substantial modifications discussed below, we adopt the amendments to rule 5-1.1(g) proposed by the Task Force.

## BACKGROUND

In 1978, this Court adopted the nation's first Interest on Trust Accounts Program. *In re Interest on Trust Accounts*, 356 So. 2d 799 (Fla. 1978). The program became fully operational in 1981, *see In re Interest on Trust Accounts*, 402 So. 2d 389 (Fla. 1981), and

currently operates pursuant to the provisions of rule 5-1.1(g). All funds generated by the IOTA program flow to The Florida Bar Foundation, Inc. (Foundation) to "fund programs which are designed to improve the administration of justice or to expand the delivery of legal services to the poor." *In re Interest on Trust Accounts*, 538 So. 2d 448, 450 (Fla. 1989); *see also* R. Regulating Fla. Bar 5-1.1(g)(1)(C) (defining IOTA account as an interest or dividend-bearing trust account benefiting the Foundation).

In the years since the IOTA program became operational, Florida's population, along with the need among its low-income citizens for direct civil legal services, has grown significantly. Of Florida's approximately 7.5 million households, over 1 million live in poverty, and over 4.2 million Floridians have an income that is below 125% of the Federal Poverty Level, making them eligible for services from one of Florida's civil legal aid organizations. *See* Task Force on Distrib. of IOTA Funds, *Final Report of the Task Force on Distribution of IOTA Funds*, app. D (2020) (on file with Clerk, Fla. Sup. Ct.). Further, an estimated 5.87 million low-and-moderate income Floridians are likely to experience a civil legal issue each year, while roughly only 80,399 low-income Floridians are assisted

annually by civil legal aid organizations. *Id.* At the same time, the amount of funds generated by the IOTA program on an annual basis has decreased sharply in recent years from a precipitous decline in interest rates and a host of other economic factors.

Against this backdrop, the Court formed the Task Force in October 2019 to examine whether rule 5-1.1(g) should be amended "to better ensure the most effective use of IOTA funds." *In re Task Force on Distribution of IOTA Funds*, Fla. Admin. Order No. AOSC19-70 (Fla. Oct. 24, 2019) (on file with Clerk, Fla. Sup. Ct.). The Court directed the Task Force to "give priority consideration to the need for funding direct legal services for low-income litigants," and to examine and make recommendations on: (1) alternative models for the distribution of IOTA funds; (2) whether specific priorities should be established for the use of IOTA funds; (3) whether specific requirements or limitations should be imposed on the use of IOTA funds; (4) whether reporting requirements on the distribution and use of IOTA funds should be adopted; and (5) any other matters related to the effective use of IOTA funds. *Id.*

The Task Force conducted a thorough review of the IOTA program, held multiple public hearings, and solicited input from

various stakeholders. Afterward, it submitted a final report proposing amendments to rule 5-1.1(g). The proposed amendments, which were unanimously approved by the Task Force, restrict the use of IOTA funds to the provision or facilitation of direct legal services to low-income persons, and impose various annual reporting requirements on the Foundation and the grantee organizations that receive IOTA funds.

The Court treated the Task Force's final report as a petition to amend the Bar Rules and published its proposal for comment. Fourteen comments were received. The Task Force filed a response, and a reply was filed by the Florida Civil Legal Aid Association, in which many of the other commenters joined. Having considered the proposed amendments, the comments filed, the Task Force's response, and the joint reply, as well as having had the benefit of oral argument, we adopt the amendments to Bar Rule 5-1.1(g) proposed by the Task Force with the modifications discussed below.

**AMENDMENTS**

First, subdivision (g)(1) (Definitions) is amended to include new subdivisions (G) through (J). The new subdivisions contain definitions for the phrases "qualified grantee organization,"

"qualified legal services," "qualified legal services provider," "direct expenses required to administer the IOTA funds," and "the court." We modify the Task Force's proposed definition in subdivision (g)(1)(G) for "qualified legal services" to clarify that such services include "post-conviction representation, programs that assist low-income clients in navigating legal processes, and the publication of legal forms or other legal resources for use by pro se litigants." We also add subdivision (g)(1)(I)(iv) to the Task Force's proposed definition for "direct expenses required to administer the IOTA funds" to clarify that such expenses include "direct costs to administer the Loan Repayment Assistance Program and to distribute funds in connection with the program (but not the program funds themselves)." In making this latter modification, we emphasize that funds distributed to eligible attorneys as part of the Loan Repayment Assistance Program are not "direct expenses required to administer the IOTA funds" as defined in subdivision (g)(1)(I).

Next, new subdivisions (g)(8) through (g)(12) are added to rule 5-1.1. New subdivision (g)(8) (Distribution of IOTA Funds by the Foundation) requires the Foundation to maintain IOTA funds

separate from all other funds, and sets out when and under what circumstances the distribution of such funds is to occur. We modify the Task Force's proposed subdivision to clarify that the Foundation, no later than six months after the fiscal year, must distribute to one or more qualified grantee organizations all IOTA funds collected that fiscal year, minus direct expenses required to administer the IOTA funds, funds required to fund the Loan Repayment Assistance Program, and any additional reserves specifically authorized by the Court. This modification ensures that the Foundation continues its current practice of awarding grants on an annual basis, allowing grantee organizations to effectively conduct annual budgeting and long-term planning. We also modify the Task Force's proposed subdivision to make clear that the objective standards the Foundation is required to adopt for the selection of qualified grantee organizations must require that IOTA funds be used to "facilitate or directly provide qualified legal services by qualified legal services providers."

We acknowledge that the adoption of subdivisions (g)(1)(I) and (g)(8) will limit the amount of IOTA funds the Foundation is able to devote to reserves on an annual basis. However, none of the

amendments we adopt today affect the extensive reserves already in the Foundation's possession, or precludes the Foundation from using any of its other revenue streams to supplement its reserves or to fund activities unrelated to the facilitation or provision of qualified legal services.  Further, if the Foundation's reserves become insufficient for any reason to ensure the stable distribution of IOTA funds—e.g., after providing vital support to legal organizations in the wake of a natural disaster or other unforeseen event—the Foundation can always seek approval from the Court to retain additional funds for reserves under subdivision (g)(1)(I) that exceed the 15% cap on "direct expenses required to administer the IOTA funds."

New subdivision (g)(9) (Use of IOTA Funds by Qualified Grantee Organizations) sets out how much and for what purposes a qualified grantee organization may expend IOTA funds.  We modify the Task Force's proposed subdivision to require a qualified grantee organization to expend at least 85% of the IOTA funds it receives "to facilitate qualified legal service providers providing or facilitating the provision of qualified legal services," and to expend no more than 15% of the IOTA funds received on "general administrative expenses

not directly supporting the provision of qualified legal services and establishing reserves." We also modify the Task Force's proposed subdivision to require a qualified grantee organization to provide the Foundation with a written justification if it expends more than 15% of the IOTA funds it receives on general administrative expenses. To clarify what types of expenditures are included under "expenses that otherwise directly facilitate providing qualified legal services," we modify the Task Force's proposed subdivision (g)(9)(D) to make clear that such expenses include "training, legal research, and technology necessary to the provision of qualified legal services."

New subdivision (g)(10) (Reporting by the Foundation) requires the Foundation to annually certify to the Court its compliance with rule 5-1.1(g) and to include certain information with its certification. We modify the Task Force's proposed subdivision to require the Foundation to also include with its certification "the total amount distributed under the Loan Repayment Assistance Program and the number of qualified legal services providers to whom distributions were made."

Lastly, we decline to adopt the Task Force's proposed subdivision (g)(13) (Effective Date and Transitional Rule). The subdivision is not necessary in light of our modifications to the Task Force's proposal.

**CONCLUSION**

Throughout these proceedings, many have urged us to maintain the status quo with respect to the use and distribution of IOTA funds. But the status quo, as the above cited statistics suggest, is becoming increasingly untenable, as a significant number of Floridians continue to go without access to civil justice. This Court is committed to improving access to justice throughout the state, and the amendments we adopt today are a step in that direction, as the bulk of IOTA funds collected will now be used to facilitate or provide direct legal services to low-income Floridians.

Accordingly, we thank the members of the Task Force for their hard work and express our appreciation to all of those who either filed comments or aided the Task Force in the development of its proposal. The Rules Regulating the Florida Bar are hereby amended as reflected in the appendix to this opinion. New language is indicated by underscoring; deletions are indicated by

struck-through type.  The amendments become effective on July 1, 2021, at 12:01 a.m.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, MUÑIZ, COURIEL, and GROSSHANS, JJ., concur.
LABARGA, J., concurs in part and dissents in part with an opinion.

THE FILING OF A MOTION FOR REHEARING SHALL NOT ALTER THE EFFECTIVE DATE OF THESE AMENDMENTS.

LABARGA, J., concurring in part and dissenting in part.

The Florida Bar Foundation (Foundation) is a public charity that provides funding for legal services to the needy and funds programs designed to improve the administration of justice.  Its goal is simply to provide greater access to justice.  Indeed, as noted by the majority, "all funds generated by the IOTA program flow to the [Foundation] to fund programs which are designed to improve the administration of justice or to expand the delivery of legal services to the poor."  Majority op. at 2 (quoting *Matter of Interest on Trust Accounts*, 538 So. 2d 448, 450 (Fla. 1989)).

As noted by the Florida Civil Legal Aid Association in its comments in response to the Task Force's final report, Florida does not provide any state funding to cover legal aid expenses.  In this

- 10 -

respect, Florida is unlike forty-seven other states, which do provide some level of civil legal aid funding. In the absence of funding at the state level, the Foundation has provided core operating support to Florida's civil legal aid organizations. Such support has filled in the gaps in funding obtained from other sources.

Simply stated, access to civil justice for low-income Floridians would be catastrophically diminished without funds generated by the IOTA program and the Foundation's strategic grantmaking and investment assessment, training, and technology and technical assistance to help grantees build capacity and operate efficiently and effectively. Given this contribution to the goal of providing greater access to civil justice, it should come as no surprise that thirty-four past presidents of The Florida Bar and twenty-six past presidents of the Foundation collectively opposed the Task Force's proposal.

I welcome the improvements made by the majority to various proposals submitted by the Task Force which, if left unchanged, would have inflicted a grappling hold on the ability of grantees to deliver legal services to the needy. However, because I do not agree that a number of these proposals are necessary to begin with, I

cannot concur with their inclusion.  I will begin with the proposals I agree with.

**Reporting by the Foundation**

New subdivision (g)(10) requires the Foundation to provide the Court with an annual audit of IOTA funds and to certify that it is in compliance with the requirements of rule 5-1.1(g).  The certification must include: (1) the amount of IOTA funds received; (2) a detailed breakdown of direct expenses required to administer IOTA funds; (3) the name of each qualified grantee organization that received a distribution; (4) the amount each qualified grantee organization received; (5) a description of the process for selecting each qualified grantee organization, including the objective standards developed for that purpose; (6) the total amount of funds received from sources other than IOTA; (7) a detailed summary of the information provided to the Foundation from qualified grantee organizations as required by subdivision (11) of this rule; (8) the total amount distributed under the Loan Repayment Assistance Program and the number of qualified legal services providers to whom distributions were made; and (9) any other information the Court determines is relevant.

**Reporting by Qualified Grantee Organizations**

In addition, subsection (g)(11) requires qualified grantee organizations to annually certify to the Foundation their compliance with rule 5-1.1(g)'s requirements on the use of IOTA funds. This subsection includes an exhaustive list of detailed requirements of information grantee organizations must provide, in addition to "any other information the court determines is relevant." The certification must include: (1) the number of qualified legal services providers compensated or facilitated by the use of IOTA funds; (2) the number of clients receiving qualified legal services paid for or facilitated by the use of IOTA funds; (3) the number of low-income Floridians who, while not directly compensated, are nevertheless impacted by qualified legal services paid for or facilitated by the use of IOTA funds; (4) the number of hours expended delivering qualified legal services paid for or facilitated by the use of IOTA funds; (5) the types of matters for which clients received qualified legal services paid for or facilitated by the use of IOTA funds; (6) an accounting of the use of IOTA funds, including the amount used to establish reserves and pay for overhead and administrative

expenses; and (7) the total amount received from sources other than IOTA funds by the qualified grantee organization.

### Required Review by the Court and Catch-all Provision

What is more, subsection (g)(12) requires "the court [to] cause a review of these amendments to be conducted to advise the court regarding their overall efficacy 2 years after their effective date." This review includes the following catch-all provision: "the scope of this review may also include any other matters related to the IOTA program." Thus, should the audits, reporting, and certification requirements of subsections (g)(10) and (11) miss any suspected misuse of IOTA funds, the Court has added a third layer of review to look further.

Because the exhaustive auditing, reporting, certification, and court review requirements of subsections (g)(10), (11), and (12) ensure a high level of supervision, oversight, and transparency, I concur with their inclusion in rule 5-1.1(g).

### The Innocence Project of Florida

According to the comments of The Innocence Project of Florida (IPF) in response to the proposals of the Task Force, IPF has assisted in obtaining the release of twenty-five innocent individuals

since its inception in 2003. It received its first IOTA grant in 2006, which allowed IPF to hire its first two staff lawyers. Since that time, IPF has received a competitive grant award each year to support its efforts to find and represent indigent innocent individuals in Florida prisons. The comments describe IPF's use of IOTA funding as follows:

> The availability of IOTA funding has enabled IPF to expand access to the type of vital scientific testing that is essential to proving innocence of a crime many years after conviction.
> It has also enabled IPF's advocacy for broader access to postconviction relief mechanisms where new evidence of innocence exists. And it has helped IPF to create, through successful appellate litigation, justice-driven processes for resolving postconviction claims.

IPF observes that because of the award of IOTA funds, these successes have further led to improvements in the fair and effective administration of justice.

Subsection (g)(1)(G) of the Task Force's proposal included a definition of "qualified legal services" that could have been interpreted to exclude funding for projects such as The Innocence Project of Florida. It basically limited such funding to "free legal services provided directly to low-income clients for their civil legal needs in Florida." Thankfully, the majority removed any doubt

concerning IPF's eligibility to receive IOTA funds by simply

modifying the definition.  The new modified definition of "qualified

legal services" provides:

> "Qualified legal services" are free legal services provided directly to low-income clients for their civil legal needs in Florida, *and includes post-conviction representation* and programs that assist low-income clients in navigating legal processes and the publication of legal forms or other legal resources for use by pro se litigants.

(Emphasis added.)  I wholeheartedly agree with the majority's

substantial modification in this instance and concur with its

inclusion in rule 5-1.1(g).

### Use of IOTA Funds by Qualified Grantee Organizations

The Task Force's final report proposed a 10% cap on the

amount qualified grantee organizations may expend for

administrative expenses and establishing reserves from IOTA funds.

According to subsection (g)(9) of the Task Force's proposed rules

governing the distribution of IOTA funds, "[a] qualified grantee

organization must expend at least 90% of the IOTA funds received

to facilitate qualified legal service providers providing qualified legal

services.  A qualified grantee organization must spend no more than

10% of the IOTA funds received for administrative expenses and

establishing reserves." Subsection (g)(9) included rent, training, and technology in its definition of administrative expenses and limited "expenditures to facilitate qualified legal service providers providing qualified legal services" to compensation for legal service providers; staff who directly assist legal service providers, such as paralegals; staff necessary to coordinate volunteer legal service providers; or expenses that directly facilitate providing qualified legal services.

Conspicuously missing from this list were expenses for training and technology necessary to the provision of qualified legal services. Thankfully, the majority modified subdivision (g)(9)(D) to include "expenses that otherwise directly facilitate providing qualified legal services, *including training and technology necessary to the provision of qualified legal services.*" (Emphasis added.)

I agree with this modification and concur with its inclusion. I cannot, however, concur with the remainder of the majority's modified subdivision (g)(9).

The majority accepted the Task Force's premise that qualified grantee organizations receiving IOTA funds must be required to limit expenditures on general administrative expenses such as rent,

training, and technology. The Task Force chose a 10% cap—a choice that can only be reasonably described as arbitrary. According to the Florida Civil Legal Aid Association's comments, the 10% cap proposed by the Task Force would have severe implications for the ability of civil legal organizations to cover direct and indirect expenses associated with hiring an attorney. These expenses include legal staff training, the purchase of technology such as case management software and legal research subscriptions, building rental and related expenses, and attorney travel and training.

The comment further explained that to compensate for the loss of IOTA funds, civil legal organizations would have to either "operate on the hope that it could somehow" obtain additional funding from another source, or take resources away from some projects to fund others. The Task Force's proposal thus places civil legal aid organizations in an untenable position that will likely require them to limit rather than expand the services they provide.

The majority modified the cap by raising it from 10% to 15% and, perhaps most importantly, by loosening the Task Force's strict cap and permitting qualified grantee organizations to provide a

written justification if the 15% cap is exceeded. This is a much softer landing than the strict prohibition proposed by the Task Force, and while these modifications are a step in the right direction, there is no need for such strict limitations on overhead. As noted earlier, subsection (g)(11)(F) requires qualified grantee organizations to annually certify to the Foundation their compliance with rule 5-1.1(g)'s requirements on the use of IOTA funds, including an accounting of the use of IOTA funds and the amount used to establish reserves and pay for overhead and administrative expenses. Clearly, if a grantee organization is unnecessarily spending too much on general administrative expenses, the Foundation will see it upon reviewing the grantee organization's annual report required by subsection (g)(11). The Court will have an opportunity to see it upon reviewing the Foundation's annual audit of IOTA funds required by subsection (g)(10), and it will have a second opportunity to look for any pattern of overspending during the review required by (g)(12). Given the requirements of these thorough oversight provisions, and the lack of any factual findings of rampant unnecessary spending by grantees, I see no need to impose any limitation on expenditures on general administrative

expenses—subsections (g)(10), (11), and (12) provide more than sufficient oversight.

Ironically, the majority's mandate imposes on the Foundation and on grantee organizations an exhaustive labor-intensive annual accounting, reporting, and certification requirement that will surely necessitate the hiring of qualified staff capable of performing such tasks, while simultaneously imposing a 15% limitation on administrative expenses. I respectfully dissent to the inclusion of this unnecessary and perhaps punitive provision in rule 5-1.1(g).

## Distribution of IOTA Funds by the Foundation

The majority's modified subdivision (g)(8) requires the Foundation to maintain IOTA funds separate from all other funds and sets forth when and under what circumstances the distribution of such funds may occur. Majority op. at 6. Specifically, subdivision (g)(8) requires the Foundation to distribute to qualified grantee organizations all IOTA funds collected that fiscal year, minus direct expenses, within six months of the end of the fiscal year. Majority op. at 6.

According to the comments submitted by the Florida Civil Legal Aid Association, this requirement will negatively impact the

Foundation in two significant ways. First, this requirement will eliminate the current ability of qualified grantee organizations to conduct annual budgeting. Requiring the disbursement of funds within six months of receipt creates uncertainty as to funding, and in particular, this requirement will make it difficult to retain staff.

Second, this requirement will eliminate the Foundation's reserve policy. The Association warns that this requirement will destabilize funding and undermine organizations' abilities to maintain a "modicum of funding stability in a volatile economy." Of particular concern—especially in the hurricane-prone state of Florida—is that eliminating the reserve policy will undermine the Foundation's ability to provide vital support to legal organizations in the wake of a disaster. Without such reserves, the Foundation will be unable to help vulnerable communities recover from these disasters by providing necessary education and outreach.

Again, despite the exhaustive oversight requirements of new subdivisions (g)(10), (11), and (12), the majority imposes another unnecessary budgetary requirement that will undoubtedly lead to difficult financial, planning, and staffing consequences for grantees that deliver legal services to the needy. Because I cannot agree to

such an unnecessary exercise, I dissent to this provision being included.

## Conclusion

As should be expected of any organization receiving public funding to fulfill its mission, financial and budgetary oversight is a necessary and integral part of the transparency process.  Here, subsections (10) and (11) of rule 5-1.1(g) impose annual auditing, reporting, certification, and review requirements that more than suffice to ensure fiscal responsibility and transparency.  In addition, subsection (g)(12) provides for an additional layer of review by the Court two years after the effective date of these amendments, the scope of which "may also include any other matters related to the IOTA program."  There is plenty of oversight.  The amendments to rule 5-1.1(g) should have stopped there.  Instead, unfortunately, the majority adopted the Task Force's proposal and needlessly included, with some modifications, a series of unnecessary budgetary constraints that will undoubtedly hinder the delivery of legal services to the needy.  As observed by the collective comment of twenty-six past presidents of the Foundation in response to the Task Force's proposal:

The Task Force has not presented any evidence—or made any findings—of any flaws in the present, long-standing structural arrangement for the deployment of IOTA funds.  Task Force Report, Appendix J, at J-532.  This Court should not discard the model developed by this Court, the Bar, and the Foundation over a 50-year period—that other jurisdictions have imitated—based on the Task Force's tenuous evidentiary record, lacking any expert analysis.

Granted, the Task Force did conduct a survey of sixty-eight bar associations and groups, twenty-five of which responded.  Task Force Report, Appendix K.  None of the survey responses provide any data on how the Task Force's proposed changes will impact Florida's IOTA program, the provision of legal services to the poor, or the administration of justice.  Id.  To the contrary, the survey shows that many jurisdictions are following Florida's present IOTA program . . . .

The Florida Bar Foundation, through its grantees and programs designed to improve the administration of justice, has been successful in advancing the delivery of civil legal services to the needy since its inception.  As noted by the comment of past Foundation presidents, the Task Force has not identified any problems or flaws with the arrangement for the deployment of IOTA funds, nor has it presented any evidence or developed any analysis on what impact its proposal will have on legal aid organizations.  Thus, the drastic changes proposed by the Task Force, and

substantially adopted by the majority, raise the question: if something is working well, why not just leave it alone.

I join the majority in thanking the members of the Task Force for their hard work and dedication to this task. I also thank those who filed comments, which I found very helpful.

I concur and respectfully dissent as noted above.

Original Proceeding – Florida Rules Regulating The Florida Bar

Mayanne Downs, Chair, Orlando, Florida, Karen J. Ladis, Miami, Florida, Laird A. Lile, Naples, Florida, Hala A. Sandridge, Tampa, Florida, Honorable Edwin A. Scales, III, Miami, Florida, John M. Stewart, Vero Beach, Florida, M. Scott Thomas, Task Force on Distribution of IOTA Funds, Jacksonville, Florida, Joshua E. Doyle, Executive Director, and Elizabeth Clark Tarbert, Ethics Counsel, The Florida Bar, Tallahassee, Florida,

for Petitioner

Chris W. Altenbernd of Banker Lopez Gassler P.A., Tampa, Florida, and Raymond T. Elligett Jr. of Buell & Elligett, P.A., on behalf of Bay Area Legal Services, Inc., Tampa, Florida; Sylvia H. Walbolt and Peter D. Webster of Carlton Fields Jorden Burt, P.A., Miami, Florida, and Joshua Herington Roberts and George E. Schulz, Jr. of Holland & Knight, LLP, on behalf of The Florida Bar Foundation, Jacksonville, Florida; Christopher V. Carlyle of The Carlyle Appellate Law Firm, on behalf of Texas Access for Justice Foundation, Orlando, Florida; Bryan S. Gowdy of Creed & Gowdy, P.A., on behalf of Past Presidents of The Florida Bar Foundation, Jacksonville, Florida; Raoul G. Cantero of White & Case LLP, Jacksonville, Florida, and John A. DeVault III of Bedell, Dittmar, DeVault, Pillans & Coxe, on behalf of 34 Former Presidents of The Florida Bar, Miami, Florida; Michael March Brownlee of The Brownlee Law Firm, Orlando, Florida, and Jodi Siegel, on behalf of

Southern Legal Counsel, Inc., Gainesville, Florida; John B. Macdonald, on behalf of the Business Law Section of The Florida Bar, Jacksonville, Florida; Elliot H. Scherker of Greenberg Traurig, P.A., on behalf of The Innocence Project of Florida, Inc. Miami, Florida; Katherine E. Giddings and Kristen M. Fiore of Akerman LLP, Tallahassee, Florida, Christine B. Gardner of Akerman LLP, West Palm Beach, Florida, Gerald B. Cope Jr. of Akerman LLP, Miami, Florida, and Samantha Howell of Southern Legal Counsel, Inc., on behalf of the Florida Pro Bono Coordinators Association, Gainesville, Florida; Anthony Charles Musto, on behalf of The Florida Bar Public Interest Law Section, Hallandale Beach, Florida; Dineen Pashoukos Wasylik of DPW Legal, on behalf of the Pro Bono Legal Services Committee of The Florida Bar, Tampa, Florida; Steven L. Brannock and Torri D. Macarages of Brannock Humphries & Berman, on behalf of Florida's Children First, Tampa, Florida; John S. Mills and Thomas D. Hall of Bishop & Mills, PLLC, Jacksonville, Florida, Bailey Howard of Bishop & Mills, PLLC, Tallahassee, Florida, and Robert Bradley Jr. of Bradley, Garrison & Komando, P.A., on behalf of Florida Civil Legal Aid Association, Orange Park, Florida; and Radhika M. Singh on behalf of the National Legal Aid & Defender Association, Washington, District of Columbia;

Responding with comments

**Appendix**

**RULES REGULATING THE FLORIDA BAR
CHAPTER 5 RULES REGULATING TRUST ACCOUNTS
5-1 GENERALLY
RULE 5-1.1 TRUST ACCOUNTS**

**(a)-(f)**   [NO CHANGE]

**(g)  Interest on Trust Accounts (IOTA) Program.**

(1)  *Definitions.*  As used in this rule, the term:

(A)  [NO CHANGE]

(B)  "Foundation" means The Florida Bar Foundation, Inc. which serves as the designated IOTA fund administrator and monitors and receives IOTA funds from eligible institutions and distributes IOTA funds consistent with the obligations and directives in this rule.

(C)-(E)  [NO CHANGE]

(F)  A "qualified grantee organization" is a charitable or other nonprofit organization that facilitates or directly provides qualified legal services by qualified legal services providers and that has experience in successfully doing so.

(G)  "Qualified legal services" are free legal services provided directly to low-income clients for their civil legal needs in Florida, and includes post-conviction representation, programs that assist low-income clients in navigating legal processes, and the publication of legal forms or other legal resources for use by pro se litigants.

(H)  A "qualified legal services provider" is a member of The Florida Bar or other individual authorized by the Rules Regulating The Florida Bar or other law to provide qualified legal services.

(I) "Direct expenses required to administer the IOTA funds" means those actual costs directly incurred by the foundation

in performing the obligations imposed by this rule. Direct expenses required to administer the IOTA funds must not exceed 15% of collected IOTA funds in any fiscal year without the court's prior approval. These costs include preparation of the foundation's annual audit on IOTA funds, compensation of staff who exclusively perform the required collection, distribution, and reporting obligations imposed by this rule and overhead expenses of the foundation directly related to fulfilling its obligations under this rule. Direct expenses required to administer the IOTA funds also include:

(i) actual costs and expenses incurred by the foundation to increase the amount of IOTA funds available for distribution;

(ii) funding of reserves deemed by the foundation to be reasonably prudent to promote stability in distribution of IOTA funds to qualified grantee organizations;

(iii) direct costs related to providing training and technology to qualified grantee organizations, as specified below; and

(iv) direct costs to administer the Loan Repayment Assistance Program and to distribute funds in connection with the program (but not the program funds themselves).

(J) "The court" means the Florida Supreme Court.

(2)-(7)     [NO CHANGE]

(8) *Distribution of IOTA Funds by the Foundation.* No later than 6 months after the fiscal year, the foundation must distribute to 1 or more qualified grantee organizations all IOTA funds collected that fiscal year except for direct expenses required to administer the IOTA funds, funds required to fund the Loan Repayment Assistance Program, and an additional reserve amount if requested by the foundation and approved by the court. Prior to distribution, the foundation must maintain IOTA funds separate from other foundation funds. The foundation may not condition distribution of IOTA funds to a

- 27 -

qualified grantee organization on payment to the foundation for any purpose, including training or technology.  The foundation must select qualified grantee organizations based on objective standards it develops.  When adopted, the foundation must provide those standards to both The Florida Bar and the court and also prominently publish those standards on the foundation's website.  The standards must require that IOTA funds be used to facilitate or directly provide qualified legal services by qualified legal services providers and, to ensure fair distribution of IOTA funds across Florida, must consider relevant data, including:

(A)  demographic data provided by an appropriate governmental agency, such as the U.S. Bureau of Labor Statistics; and

(B)  data provided by the qualified grantee organization on the use of any IOTA funds previously received.

(9)  *Use of IOTA Funds by Qualified Grantee Organizations.*  A qualified grantee organization must expend at least 85% of the IOTA funds received to facilitate qualified legal service providers providing or facilitating the provision of qualified legal services or, if such expenditures in any given year constitute less than 85% of the IOTA funds received, provide to the foundation a written justification.  A qualified grantee organization must expend no more than 15% of the IOTA funds received for general administrative expenses not directly supporting the provision of qualified legal services and establishing reserves or, if such expenditures in any given year constitute more than 15% of the IOTA funds received, provide to the foundation a written justification.  Except as provided below, general administrative expenses include rent, training, and technology.  Expenditures to facilitate qualified legal service providers providing or facilitating the provision of qualified legal services are limited to:

(A)  compensation paid to qualified legal service providers;

(B)  compensation paid to support staff who are directly assisting qualified legal services providers, such as paralegals;

(C)  compensation paid to staff necessary for coordinating volunteer qualified legal service providers; or

(D)  expenses that otherwise directly facilitate providing qualified legal services, including training, legal research, and technology necessary to the provision of qualified legal services.

Compensation includes benefits such as health insurance and bar membership fees.

(10)  *Reporting by the Foundation.*  In addition to providing the court with a copy of the annual audit of IOTA funds, the foundation must annually certify to the court its compliance with this rule's requirements on the use of IOTA funds.  This certification must include, but not be limited to:

(A)  the amount of IOTA funds received;

(B)  a detailed breakdown of direct expenses required to administer the IOTA funds;

(C)  the name of each qualified grantee organization to which distributions were made;

(D)  the amount of distribution received by each qualified grantee organization;

(E)  a description of the process for determining eligibility and selection of each qualified grantee organization, including the objective standards developed for that purpose;

(F)  the total amount received from sources other than IOTA funds;

(G)  a detailed summary of the information provided to the foundation from qualified grantee organizations as required by subdivision (11) of this rule;

(H)  the total amount distributed under the Loan Repayment Assistance Program and the number of qualified legal services providers to whom distributions were made; and

(I)  any other information the court determines is relevant.

(11)  *Reporting by Qualified Grantee Organizations.*  Qualified grantee organizations must annually certify to the foundation their compliance with this rule's requirements on the use of IOTA funds.  This certification must include, but not be limited to:

(A)  the number of qualified legal services providers compensated or facilitated by the use of IOTA funds;

(B)  the number of clients receiving qualified legal services paid for or facilitated by the use of IOTA funds;

(C)  the number of low-income Floridians who, while not directly represented, are nevertheless assisted by qualified legal services paid for or facilitated by the use of IOTA funds;

(D)  the number of hours expended delivering qualified legal services paid for or facilitated by the use of IOTA funds;

(E)  the types of matters for which clients received qualified legal services paid for or facilitated by the use of IOTA funds;

(F)  an accounting of the use of IOTA funds, including the amount used to establish reserves and pay for overhead and other general administrative expenses;

(G)  the total amount received from sources other than IOTA funds by the qualified grantee organization; and

(H)  any other information the court determines is relevant.

(12)  *Required Review.*  The court will cause a review of the amendments to rule 5-1.1(g) finally adopted by the court on

<u>June 18, 2021, to be conducted to advise the court regarding their overall efficacy 2 years after their effective date.  The scope of this review may also include any other matters related to the IOTA program.</u>

**(h)-(k)**  [NO CHANGE]

## Comment

A lawyer must hold property of others with the care required of a professional fiduciary.  This chapter requires maintenance of a bank or savings and loan association account, clearly labeled as a trust account and in which only client or third party trust funds are held.

Securities should be kept in a safe deposit box, except when some other form of safekeeping is warranted by special circumstances.

All property that is the property of clients or third persons should be kept separate from the lawyer's business and personal property and, if money, in 1 or more trust accounts, unless requested otherwise in writing by the client.  Separate trust accounts may be warranted when administering estate money or acting in similar fiduciary capacities.

A lawyer who holds funds for a client or third person and who determines that the funds are not nominal or short term as defined elsewhere in this subchapter should hold the funds in a separate interest-bearing account with the interest accruing to the benefit of the client or third person unless directed otherwise in writing by the client or third person.

Lawyers often receive funds from which the lawyer's fee will be paid.   The lawyer is not required to remit to the client funds that the lawyer reasonably believes represent fees owed.  However, a lawyer may not hold funds to coerce a client into accepting the lawyer's contention.  The disputed portion of the funds must be kept in a trust account and the lawyer should suggest means for

prompt resolution of the dispute, such as arbitration. The undisputed portion of the funds must be promptly distributed.

Third parties, such as a client's creditors, may have lawful claims against funds or other property in a lawyer's custody. A lawyer may have a duty under applicable law to protect these third-party claims against wrongful interference by the client. When the lawyer has a duty under applicable law to protect the third-party claim and the third-party claim is not frivolous under applicable law, the lawyer must refuse to surrender the property to the client until the claims are resolved. However, a lawyer should not unilaterally assume to arbitrate a dispute between the client and the third party, and, where appropriate, the lawyer should consider the possibility of depositing the property or funds in dispute into the registry of the applicable court so that the matter may be adjudicated.

The Supreme Court of Florida has held that lawyer trust accounts may be the proper target of garnishment actions. *See Arnold, Matheny and Eagan, P.A. v. First American Holdings, Inc.*, 982 So. 2d 628 (Fla. 2008). Under certain circumstances lawyers may have a legal duty to protect funds in the lawyer's trust account that have been assigned to doctors, hospitals, or other health care providers directly or designated as Medpay by an insurer. *See The Florida Bar v. Silver*, 788 So. 2d 958 (Fla. 2001); *The Florida Bar v. Krasnove*, 697 So. 2d 1208 (Fla. 1997); *The Florida Bar v. Neely*, 587 So. 2d 465 (Fla. 1991); Florida Ethics Opinion 02-4.

The obligations of a lawyer under this chapter are independent of those arising from activity other than rendering legal services. For example, a lawyer who serves only as an escrow agent is governed by the applicable law relating to fiduciaries even though the lawyer does not render legal services in the transaction and is not governed by this rule. However, where a lawyer is an escrow agent and represents a party to a transaction involving the escrowed funds, the Supreme Court of Florida has held that lawyers acting as escrow agents have a fiduciary duty to protect the interests of all parties having an interest in escrowed funds whether the funds are in a lawyer's trust account or a separate escrow

account.  *The Florida Bar v. Golden,* 566 So. 2d 1286 (Fla. 1990); *see also The Florida Bar v. Hines*, 39 So. 3d 1196 (Fla. 2010); *The Florida Bar v. Marrero,* 157 So. 3d 1020 (Fla. 2015).

Each lawyer is required to be familiar with and comply with the Rules Regulating Trust Accounts as adopted by the Supreme Court of Florida.

Money or other property entrusted to a lawyer for a specific purpose, including advances for fees, costs, and expenses, is held in trust and must be applied only to that purpose.  Money and other property of clients coming into the hands of a lawyer are not subject to counterclaim or setoff for attorney's fees, and a refusal to account for and deliver over the property on demand must be a conversion.  This does not preclude the retention of money or other property on which a lawyer has a valid lien for services or to preclude the payment of agreed fees from the proceeds of transactions or collections.

Advances for fees and costs (funds against which costs and fees are billed) are the property of the client or third party paying same on a client's behalf and are required to be maintained in trust, separate from the lawyer's property.  Retainers are not funds against which future services are billed.  Retainers are funds paid to guarantee the future availability of the lawyer's legal services and are earned by the lawyer on receipt.  Retainers, being funds of the lawyer, may not be placed in the client's trust account.

The test of excessiveness found elsewhere in the Rules Regulating The Florida Bar applies to all fees for legal services including retainers, nonrefundable retainers, and minimum or flat fees.

### **Foundation Provision of Training and Technology; Grantees' Funds from Non-IOTA Sources**

<u>While the foundation may use IOTA funds to provide training and technology to qualified grantee organizations, and qualified grantee organizations may use disbursed IOTA funds to pay the</u>

foundation for that training and technology, the foundation may not condition a grant on payment for these, or any, services provided by the foundation to the qualified grantee organization.  For instance, the foundation may arrange for bulk purchasing of technology which can then be provided to a qualified grantee organization at a lower cost than would be otherwise available to the qualified grantee organization, but the foundation may not, as a grant condition, require the grantee to pay the foundation for such services.  A qualified grantee organization should, but is not required to, receive funds from sources other than IOTA funds to support its overall mission.